[Civ. No. 19959.   Second Dist., Div. Three.   July 20, 1954.]

ARNO HIEHLE, Plaintiff and Respondent, v. TORRANCE MILLWORKS, INC. (a Corporation), Defendant and Respondent; S. J. GLASER et al., Appellants.

Max Sisenwein and Samuel Maidman for Appellants.

Edmond Gattone for Plaintiff and Respondent.

Haskell H. Grodberg for Defendant and Respondent.

SHINN, P. J.—On June 30, 1952, Arno Hiehle brought an action against Torrance Millworks, Inc., and defendants Archer and Glaser (hereinafter referred to as defendants), seeking to recover monies advanced by him to the corporation, $8,000 of which was represented by a promissory note of the corporation. On or about September 4, 1952, the corporation was adjudicated a bankrupt on its voluntary petition. On November 5th the trustee in bankruptcy, E. A. Lynch, intervened on behalf of the corporation, seeking a dismissal of plaintiff's action and a declaratory judgment that defendants were the *alter ego* of the corporation and hence responsible for its debts. The court awarded a judgment that plaintiff Hiehle recover $9,730.50, attorney's fees and costs, and that defendants Archer and Glaser were the *alter ego* of the corporation and personally liable for all its obligations.

The facts are as follows: Prior to January, 1951, defendant Archer owned and operated the J. B. Archer Cabinet Works in the city of Torrance. On January 2d Archer and Glaser filed articles of incorporation for the Torrance Millworks. Archer, Glaser, and one Clara Den were appointed to act as its first directors. The first meeting of the directors was on January 9, 1951. On January 15th, at the second meeting of the directors, Clara Den resigned, and thereafter Archer and Glaser were the only directors and officers of the corporation. There was no other meeting of the directors. During the succeeding weeks, in pursuance of an agreement concluded by the parties in December, 1950, they set up the structure of the corporation as follows: The corporation acquired Archer's machinery and equipment for a stated price of $14,000. In exchange for these assets the corporation assumed $4,000 of Archer's obligations, became indebted to him for an additional $9,000, and later issued $1,000 in stock to him. Glaser contributed $9,000 to the corporation in the form of a loan. On January 31st the corporation applied

to the Commissioner of Corporations for permission to issue $2,000 worth of stock to Archer and Glaser for cash. The application did not disclose that one of the directors had resigned and had not been replaced, and in explanation of the absence of a financial statement falsely represented that the corporation had not yet acquired either assets or liabilities. On February 6th the requested permission was granted, and thereafter the corporation issued 10 shares of $100 par value to Archer and 10 shares to Glaser. Glaser paid $1,000 for his stock. No other stock was ever issued. The corporation was unsuccessful from the start. By the end of February, 1951, the books showed a net loss of $4,371.33.

At the end of April, 1951, plaintiff was hired by the corporation as bookkeeper at a salary of $45 per week. During the next several months plaintiff at the request of defendants advanced to the business sums aggregating $4,500. On July 10th defendants delivered to plaintiff the corporation's 6 per cent promissory note for $4,000, payable on October 10th, signed by Archer and Glaser, respectively, as president and secretary of the corporation. The note was not paid on the due date. On October 12, 1951, Archer and Glaser caused to be removed from the books the $18,000 in obligations to them and caused the books to show their subscriptions for stock in that amount. The corporation's statement of financial condition of October 31st showed the elimination of the debts payable to Archer and Glaser, with explanation in the form of an item noting an $18,000 capital stock subscription. Thereafter plaintiff continued to advance funds to the corporation, and on November 28th surrendered his $4,000 note in exchange for a new note for $7,800, payable February 28, 1952. Archer and Glaser secured a $3,000 loan from the Union Bank and Trust Company on the strength of the financial statement of October 31st. No application for a permit to issue additional stock had been filed, and no stock was issued. After receiving his $7,800 note, plaintiff made further advances to the business, and from time to time was repaid small sums. On February 28, 1952, the $7,800 note was not paid, and on that date plaintiff accepted a new note of the corporation, payable May 28th, for $8,000. The court found that in extending credit to the corporation after October, 1951, plaintiff relied on defendants' promise to extinguish the $18,000 corporate liability running to them.

In the bankruptcy proceedings which ensued after plaintiff brought this action on June 30, 1952, the schedules of assets

and liabilities submitted by Archer and Glaser in support of the petition listed them as unsecured creditors with claims of $9,000 each. It further appears from these facts, and the trial court so found, that when it first acquired assets the corporation was undercapitalized, was insolvent, and that it continued to be undercapitalized and insolvent throughout its existence. It was also found by the court that the defendants used the assets of the corporation for their personal obligations. There was evidence that the telephone, gas and water services of the business were carried in Archer's name after the formation of the corporation.

The complaint of plaintiff and the complaint in intervention alleged, and the court found, that the corporation was formed pursuant to an agreement that it would be a mere agency or instrumentality through which Archer and Glaser would conduct their copartnership business and that it was in fact their *alter ego*. Defendants contend that there was insufficient evidence to support this finding. We think it was sufficiently supported.

In their opening brief defendants first state that "Proof of control, ownership of stock, unity of interest, or negligence in the operation of a corporation, are not, in the absence of fraud, injustice, or inequity, sufficient to invoke the [*alter ego*] doctrine." They say next "Before the corporate 'Veil' or 'Entity' will be pierced it must be shown that there was bad faith in the organization and operation of the corporation." Their authorities are to this general effect but their argument deals quite loosely with the evidence and fails to recognize the significance of the array of facts found. The finding here was that it was agreed that the corporation would be formed and would function as an "instrumentality for convenience in carrying out their said agreement between themselves." The significance of this agreement is that as between Archer and Glaser their relationship was that of joint adventurers or partners. The findings designated them as partners. The corporation was not an entity into which their rights and relations were merged. The finding was justified by the evidentiary facts found and other facts in evidence. (*Elsbach* v. *Mulligan*, 58 Cal.App.2d 354, 369 [136 P.2d 651]; *Conover* v. *Smith*, 83 Cal.App. 227 [256 P. 835].)

The agreement to form the corporation was in writing. While it provided that each party would subscribe $1,000 for stock to be paid for when issued it also provided that Archer would receive 10 shares of stock "*in lieu* of the cash," and

Archer paid no cash. No permit was obtained allowing the issuance of stock in exchange for Archer's assets. The agreement provided that Archer and Glaser would each receive a nonnegotiable promissory note for $9,000. While the books of the corporation reflected an indebtedness of $9,000 to each of the parties the corporation did not execute either note. The agreement provided that the parties would receive equal payments on their notes and that if either advanced any money it would be as a loan to the corporation. Each party was to devote his entire time to the business, was not to engage in any competing business and they were to draw equal compensation for their services, the amount of which was not specified. It was provided that the parties and Clara Den should constitute the board of directors and that Clara Den should resign after the first directors' meeting. There was no provision that she would be replaced and she was not replaced.

The facts that the corporation did not function as a corporation through its board of directors, did not execute the notes to Archer or Glaser, did not receive from Archer any cash for stock, or obtain a permit authorizing the issuance of stock except for cash, the false representations made in its application to issue stock, the absence of an agreement to sell other stock in order to finance the corporation, the cancellation of the $18,000 of indebtedness to Archer and Glaser, the false entries in the records showing subscriptions for $18,000 worth of stock, the use of the false statements of the corporation to obtain credit, the agreement that each of the parties should receive the same amount of compensation for his services, and that they would be the only directors and officers all tended to prove that the relation of the parties was essentially that of partners and that the corporation was one in name only. Such facts have often been deemed sufficient to justify the court in disregarding the corporate entity and applying the *alter ego* doctrine. (*D. N. & E. Walter & Co.* v. *Zuckerman,* 214 Cal. 418 [6 P.2d 251, 79 A.L.R. 329]; *Stark* v. *Coker,* 20 Cal.2d 839 [129 P.2d 390]; *Minifie* v. *Rowley,* 187 Cal. 481, 487-488 [202 P. 673].)

Defendants contend that refusal to regard the corporation as their *alter ego* would have resulted in no injustice or inequity to plaintiff and the other creditors. We do not agree. It was the purpose of Archer to relieve himself of $4,000 of obligations by having the corporation assume them. The agreement that Archer would contribute the assets of his business for a note of $9,000, the corporation would assume $4,000 of

his debts, that Glaser would advance $9,000, and that each party would contribute upon an equal basis $1,000, had all the aspects of a partnership arrangement. The equal participation in the management of the business, the time to be devoted to it, the compensation each was to receive, were all typical of the relation of partners. The only difference was that as partners each would have been liable for debts of the partnership, whereas they would not have been liable for the debts of the corporation if it had acquired the status of a separate, independent entity. ■ This is altogether a proper purpose for the formation of a bona fide corporation which is functioning as such, but it is an improper purpose where the corporate form is a mere empty shell and a blind for the operations of one or more individuals who dominate and manipulate it to the exclusion of all independent corporate action. Here the individuals contributed certain assets to the venture. That was the extent of their responsibility. They would draw compensation for their services. If the corporation was successful they would profit, if it fell into debt and failed they could lose nothing beyond the amounts they had hazarded. Moreover, if creditors should take over, the adventurers would each have a claim against the corporation for the amount of their respective contributions. As we have seen they scheduled their claims in the amount of $18,000 in the bankruptcy proceeding. The corporation started out owing money equal to the value of its assets. Its net worth was nil. ■ There was abundant evidence that it was a sham corporation. It would be unjust to permit defendants to make use of it to escape from their personal liability for its debts.

■ Defendants argue further that plaintiff may not look beyond the corporation because he accepted the corporation's note with full knowledge of the facts we have related. *Lynch* v. *McDonald*, 155 Cal. 704 [102 P. 918] and *Hanson* v. *Bradley*, 298 Mass. 371 [10 N.E.2d 259] are cited in support of the claim of estoppel. In the Lynch case a judgment denying application of the *alter ego* doctrine was affirmed. Both that case and *Hanson* v. *Bradley* were decided upon facts which distinguish them from the present case. They merely hold that the court may properly refuse to look beyond the corporation to the individuals who compose and control it where the plaintiff dealt with the corporation with full knowledge of the facts and where considerations of equity

and fair dealing do not require application of the doctrine in his behalf.

When plaintiff accepted the note in suit defendants had caused book entries to be made cancelling the corporation's indebtedness to them and purporting to show their own subscription for stock in the amount of $18,000. This manipulation, if it meant anything at all, reversed the position of the defendants and the corporation. Instead of the corporation owing the individuals $18,000 they ostensibly undertook to pay the corporation that amount for stock. They sought no permit for any such transaction. Such machinations could have had no purpose other than to picture the finances of the corporation in a better light than the facts warranted. After that plaintiff loaned additional sums. It is not a question whether plaintiff was actually defrauded but whether he is bound to accept as facts the illusions the defendants created. Having issued the note to plaintiff after charging themselves with an $18,000 stock subscription and cancelling the corporation's debt to them defendants are the ones to be estopped to say that plaintiff and the other creditors must look to the corporation alone while they seek to reinstate the corporation's obligation to them. In soliciting loans Glaser said *he* would pay as much as 15 per cent interest. Plaintiff borrowed the money he loaned the business on his life insurance and from a friend. He was dealing with individuals whom he trusted and he had every reason to believe that they were the corporation, as in fact they were. Archer and Glaser, not the corporation, were the ones who persuaded him to loan his money. Except for them there would have been no loans. The corporation had no financial worth which entitled it to credit. If the contentions of the defendants were to prevail the corporation would owe them $18,000 and they would owe nothing to plaintiff and the other creditors whose money and credit they have used.

The creditors are not to be brushed off so lightly. Defendants, in reality, were essentially partners operating through a corporate form, and they are liable for its debts. The court looked through all the make-believe to the facts of the situation and, perforce, reached a just decision.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.