[Sac. No. 6745. In Bank. Feb. 11, 1959.]

S. H. RIDDLE et al., Respondents, v. RICHARD D. LEUSCHNER et al., Appellants.

Robert D. Carter for Appellants.

Mellis & Stockton and Cleveland J. Stockton for Respondents.

GIBSON, C. J.—S. H. Riddle commenced this action for declaratory and other relief against Yosemite Creek Company, Kadota Creek Company, and most of the shareholders, officers and directors of the two companies, both of which were California corporations. He was a creditor of Yosemite and sought to hold the other defendants for the amount due from Yosemite, alleging that each of the corporations was the *alter ego* of the individual defendants. Subsequently the trial court permitted the joinder as plaintiffs of a number of other creditors of Yosemite who sought similar relief.

During the course of the suit the action was dismissed as to all individual defendants except Richard D. Leuschner, Sr., Elizabeth F. Leuschner, his wife, and Richard D. Leuschner, Jr., his son. Judgment was rendered against the two corporations and the Leuschners jointly and severally, and they appealed. The appeal was dismissed as to the two corporations, and the matter is now before us with respect only to the Leuschners.*

The corporations were organized by the Leuschner family in 1949. Mrs. Leuschner was issued 510 shares of Yosemite's stock, and in 1951 she transferred half of them to Leuschner, Jr., her stepson, and the other half to Elizabeth Leuschner Baker, her stepdaughter. Mrs. Leuschner acquired another share, and during the period when plaintiffs' claims arose in 1952 and 1953 the stock ownership of that corporation was as follows: Mrs. Leuschner, one share; Leuschner, Jr., 268 shares; Elizabeth Baker, 257 shares; and various employees, eight shares. Leuschner, Jr., and Mrs. Baker each owned one-third of the shares of Kadota, and the other third was owned by Jeannette and Homer Andre, the daughter and son-in-law of Mrs. Leuschner. Leuschner, Sr., held no shares in either corporation.

---

*The appeal was dismissed by the District Court of Appeal as to the corporations apparently on the ground that their corporate powers had been suspended pursuant to section 23301 of the Revenue and Taxation Code. The corporations did not petition this court for a hearing.

In 1952 and 1953 Leuschner, Sr., was the president of Yosemite and the assistant treasurer of Kadota, and he was active in the management of the business of both corporations. Leuschner, Jr., was the vice-president and treasurer of Yosemite and the president of Kadota. Salaries of $600 a month and $75 a week were paid to Leuschner, Sr., and his son, respectively, first by Yosemite and later by Kadota. Mrs. Leuschner was secretary of Yosemite, and the three of them were also directors of both corporations. The other officers and directors of the corporations were Elizabeth Baker and her husband, who, like Jeannette and Homer Andre, were not made defendants in this action. It thus appears that during the period important for this case the directors of the corporations were identical and that all of the stock of Kadota and practically all the shares of Yosemite were held by persons who were related by blood or marriage.

In the years from 1949 to 1953 each of the corporations held one shareholders' meeting. Neither of them held any regular meetings of their directors, but Yosemite's directors had four special meetings, and Kadota's had two. The two corporations occupied the same offices, used the same furniture and files, and retained the same bookkeeper and attorneys during considerable portions of the time between 1949 and 1954.

The three Leuschners entered into a large number of personal transactions with the corporations. On one occasion in 1949, while Mrs. Leuschner was secretary and a director of Yosemite, she borrowed about $12,000 from the corporation. At various times the Leuschners loaned their personal funds to the corporations. At least nine notes calling for 8 per cent interest and totaling $11,700 were given to Leuschner, Jr., by Yosemite, and 12 notes at the same interest totaling $33,575 were given to him by Kadota. Mrs. Leuschner made a number of loans to Yosemite, and she took at least six notes totaling $10,000 at 8 per cent from Kadota. Leuschner, Sr., also made similar loans. There was no specific, formal approval by directors or stockholders of these loans.

On a number of occasions Leuschner, Jr., and Mrs. Leuschner purchased equipment in their own names and rented it to the corporations. When a seller was about to repossess from Kadota a year-old machine sold to Kadota for $1,800, Leuschner, Jr., paid the balance due of about $200, obtained title and thereafter leased the machine to Kadota. Similarly

he purchased from a third party a fork lift truck, which he rented to Yosemite for $300 a month, and he purchased another machine, which was being used by Yosemite, and leased it to the corporation at a monthly rental of $200. Mrs. Leuschner purchased machinery from both corporations and leased some of it to Kadota. She also participated with Leuschner, Jr., in acquiring title to certain equipment by a complicated transaction whereby they furnished money to enable Yosemite to pay off a chattel mortgage on a machine which was then traded to a third party for the equipment to which she and her stepson obtained title. The result of the transaction, apparently, was that Yosemite lost title to the mortgaged machine and got nothing in return.

In many cases the documents which evidence the transactions were executed by a member of the family both in his individual capacity and as one of the officers of the corporation who signed on its behalf. For example, between May 1953 and June 1954, Leuschner, Jr., as president of Kadota, with his father as assistant secretary, executed several bills of sale of various items of machinery and equipment to himself as an individual. The minutes do not show any prior authorization or approval of any of the personal transactions by the directors or stockholders of either corporation, although there was a general resolution adopted by the stockholders of Yosemite approving all the acts of the officers and directors during the years 1950, 1951 and 1952, and there were two similar resolutions by the directors ratifying the acts of Yosemite during the years 1949, 1950 and 1951. There does not appear to have been any similar resolution by the directors of Kadota, but there is a resolution by its stockholders approving all acts of the corporation from the date of incorporation to January 1953.

Yosemite was in the business of processing fruits and vegetables. The enterprise was commenced in 1949 and was fairly extensive, each year grossing over $2,000,000 and paying almost $900,000 to growers for their produce. Kadota leased and operated farms in 1949 and 1950, but it ceased operations in the latter year and remained dormant until early in 1953. At that time Yosemite was involved in litigation with the Reconstruction Finance Corporation and the Smith Processing Company, neither of which are plaintiffs herein, and its operations were severely hampered by attachments of its bank accounts and by seizures of some of its assets. According to Leuschner, Sr., Yosemite had outstanding contracts

committing it to purchase close to a million dollars of produce from growers and to sell processed foods to various companies, but because of the attachments and seizures it was unable to operate.

On January 2, 1953, Yosemite transferred some machinery to Kadota and assigned to it a contract with a food company for the packing of spinach, and Kadota agreed to perform the contract. The remainder of Yosemite's equipment and machinery was assigned to Kadota on April 10, 1953. There was testimony by Leuschner, Sr., and his son that there was a written agreement by which Kadota undertook to perform Yosemite's contracts, but no copy of the asserted agreement could be found. According to Leuschner, Sr., Kadota supplied labor and materials, processed the produce, sold it, collected for the sales, and transferred "the difference in funds on account" to Yosemite, which paid the money to its growers and field men. A large number of checks payable to Yosemite were endorsed in favor of Kadota and deposited to the latter's account without passing through Yosemite's bank account. Yosemite continued to contract with growers for the purchase of produce during 1953. It did not pay the growers in full, and, because of this failure, its processing license from the Department of Agriculture was revoked in January of 1954. Apparently Kadota ceased operations sometime in 1954.

Yosemite's financial statement showed that the corporation had an excess of "current liabilities" over assets of $45,461.14 as of June 30, 1952, and of $156,114.78 on June 30, 1953. Kadota's "current liabilities" exceeded its assets by $17,116.34 on April 30, 1953, and by $62,890.42 on June 30, of that year.

The court found and concluded that Yosemite was indebted to plaintiffs under contracts entered into in 1952 and 1953, that Yosemite and Kadota were at all times completely controlled, dominated, managed and operated by the three Leuschners, that the corporations were such in name only and were mere fictions employed by the Leuschners, that the assets of Yosemite were intermingled with the assets of Kadota to suit the convenience of the Leuschners and to assist them in evading payment of their obligations, that after such intermingling the two corporations were not separate entities but were a single entity operating as Kadota, that there was no individuality or separateness insofar as the corporations and the Leuschners are concerned, and that each of the corporations was the *alter ego* of the Leuschners.

In *Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1], we stated that the two requirements for disregard of corporate entity are ''(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.''

The evidence is not sufficient to bring Leuschner, Sr., within the first of these requirements. It is undisputed that he held none of the stock, and there is no evidence that he had any interest as an owner in the business operated by either of the two corporations or that he had a right to share in any profits they might make. Instead, he received a monthly salary. Under all the circumstances, he is to be regarded as having been a managing employee of the two companies, and his control over their affairs must be treated as that which would be exercised by a managing agent rather than that of a shareholder or owner. It follows that there was not such unity of ''interest and ownership'' between Leuschner, Sr., and the corporations that the separate personalities of the corporations and the individual no longer existed, within the meaning of the rule set forth above. (*Cf. Shea* v. *Leonis,* 14 Cal.2d 666, 670 [96 P.2d 332] [demurrer sustained as to count failing to allege defendant had any beneficial interest in stock].)

The situation is different with respect to Leuschner, Jr., and Mrs. Leuschner, who were stockholders, and the evidence is sufficient to show that, with the help of Leuschner, Sr., they operated the corporations as their *alter egos* and that as to these two persons there was such unity of interest and ownership that the separate personalities of the corporations and the individuals no longer existed. As we have seen, Leuschner, Jr., owned over half of the outstanding shares of Yosemite and a third of the shares of Kadota during 1952 and 1953, and Mrs. Leuschner then had one share of Yosemite stock. All the remaining stock of the two corporations was owned by persons who were related to the Leuschners by blood or marriage, with the exception of eight shares of Yosemite stock owned by various employees.

The fact that Mrs. Leuschner had one share of Yosemite stock is sufficient to permit holding her personally liable to creditors of that corporation provided that the *alter ego* doctrine is otherwise applicable. (*Stark* v. *Coker,* 20 Cal. 2d 839, 846-849 [129 P.2d 390] [one share held by wife, 139

shares held by her husband, and 11 held by a person who did not participate in the corporation's business].) The lack of ownership of Kadota's stock by Mrs. Leuschner will not, of course, prevent her from being responsible for the debts of Yosemite.

The findings that the two corporations were controlled, dominated, managed, and operated by the Leuschners and that there was no separateness between them and the corporations are supported by the evidence set forth above insofar as concerns Leuschner, Jr., and the relationship between Mrs. Leuschner and Yosemite. We need not repeat that evidence in detail but may state generally that it supports inferences that these two defendants, with the aid of Leuschner, Sr., transferred most of the assets of Yosemite to Kadota, that they failed to follow normal corporate procedures with respect to holding meetings and keeping records, and that, although they were officers and directors, they entered into personal transactions with the corporations, to the disadvantage of the corporations, without prior approval of the other directors and stockholders.

The fact that both Leuschner, Jr., and Mrs. Leuschner controlled and dominated the corporations does not preclude holding each of them personally liable for the obligations of the business, since it is settled that two or more shareholders of a corporation may be liable as principals or partners under the *alter ego* principle. (*Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 520-523 [203 P.2d 522] ; *Hiehle* v. *Torrance Millworks, Inc.*, 126 Cal.App.2d 624, 628-630 [272 P.2d 780] ; see *Continental Securities etc. Co.* v. *Rawson*, 208 Cal. 228, 238-239 [280 P. 954] ; *Hotaling* v. *Hotaling*, 193 Cal. 368, 381 [224 P. 455, 56 A.L.R. 127].)

The evidence and findings are likewise sufficient to justify the conclusion that an inequitable result will follow if the acts complained of are treated as those of the corporations alone. The trial court found, as we have seen, that Yosemite's assets were intermingled with those of Kadota to suit the convenience of the Leuschners and to assist them in evading payment of their obligations and that after the intermingling the two corporations were a single entity operating as Kadota. It may reasonably be inferred that the Leuschners, without regard to the interests of Yosemite or its creditors, and at a time when Yosemite was insolvent, transferred its assets to Kadota so that they could remain in the food processing business, and that their manipulations

of the affairs of the corporations were designed to foster their own purposes and operated to the disadvantage of Yosemite and its creditors. Such conduct is inequitable within the rule of the cases which permit the disregard of the separate entity of a corporation. (*Cf. Stark* v. *Coker,* 20 Cal.2d 839, 846 et seq. [129 P.2d 390] ; *Minifie* v. *Rowley,* 187 Cal. 481, 488 [202 P. 673].)

It is claimed that this action was brought as a class suit and that the requirements of such a suit have not been met. However, there is no occasion for us to determine this question because the record shows that all creditors who were awarded damages by the judgment were joined as parties plaintiff by court order. It does not appear that the Leuschners objected to the joinder, and, in fact, their counsel stated to the trial court that any creditors had a right to come in. Accordingly, any objection to the procedure was waived.

The judgment is reversed as to Richard D. Leuschner, Sr., and is affirmed as to Richard D. Leuschner, Jr., and Mrs. Leuschner.

Traynor, J., Spence, J., and McComb, J., concurred.

Carter, J., did not participate herein.

SCHAUER, J., Dissenting.—It appears to me that the evidence in the present case falls short of establishing the requirement that fraud, injustice, or an inequitable result will follow unless the corporate entity is disregarded. (See *Automotriz etc. De California* v. *Resnick* (1957), 47 Cal.2d 792, 796 [5] [306 P.2d 1], and cases there cited; *Minifie* v. *Rowley* (1921), 187 Cal. 481, 487 [5] [202 P. 673].)

Certainly the evidence referred to in the majority opinion relates a number of facts which must be regarded as established. Principally the evidence establishes that two corporations were organized by members of the Leuschner family, that the stockholders of those corporations did control them, that there was a downward turn in the market for canned goods and that one or both of the corporations lost money, and that the Leuschners or some of them advanced more money to those corporations as loans in an effort to keep them solvent, both for the benefit of the creditors and themselves; these loans were in addition to that which had been paid in for the stock. Wherein does such evidence even tend to prove ''fraud, injustice or an inequitable result?''

Surely we may also recognize that undoubtedly the corporations were organized so that they would constitute a shield between the individual stockholders and the creditors, i.e., so that liability of the stockholders to be incurred in the dealings of the corporations would be limited to the amount of their presumptively original investment in the corporations. Is such purpose not always a material, if not controlling, factor in leading the incorporators to select the corporate form of enterprise?

Manifestly from the above recounted facts no reason whatsoever is shown for the drastic remedy of disregarding the corporate entity. As appears from the various provisions of law relating to corporations and as is even mentioned in other parts of the law, such as section 923 of the Labor Code,[1] it has been the policy of government to foster and encourage the corporate form of enterprise for the express purpose of limiting the liability of the stockholders to the funds invested in the enterprise. This objective of encouraging thrifty persons to become entrepreneurs by limiting their possible losses to the amounts originally invested is the most important element of the corporate concept. It is because of the safety.factor that investors become willing to pool their capital for larger enterprises. Even in partnerships express provision is made for the classification of partners as general and special and thereby limiting liability beyond the investment to general partners only. (See Corp. Code, § 15507 et seq.)

It is also a thoroughly established principle of law that the perpetration of fraud, or similar acts leading to injustice and inequity, is not to be lightly presumed and, indeed, that any of such acts must be established by clear and convincing proof. Fraud is closely akin to a charge of criminal conduct and the character of the proof to establish fraud should at least approximate that which is essential to prove guilt of crime. (*Hedden* v. *Waldeck* (1937), 9 Cal.2d 631, 636-637 [1-3] [72 P.2d 114].) I appreciate, of course, that it is in the trial court that the question is initially determined as to whether the evidence constitutes clear and convincing proof of the fact to be established, but that does not mean that the reviewing court shall not scrutinize the record to determine whether the facts which the evidence is sufficient to establish are of

---

[1]Lab. Code, § 923: "Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. . . ."

themselves of such a character as can, as a matter of law, constitute clear and convincing proof of fraud.

In the light of the foregoing, all of which is merely fundamental to the concept of corporate operation, and the basis for the extraordinary remedy of striking down the corporate entity, it seems to me that the evidence recounted in the opinion of the Chief Justice, as was said at the beginning, "falls short of establishing the requirement that fraud, injustice, or an inequitable result will follow unless the corporate entity is disregarded." Rather, I believe, the advancement as loans to the companies by members of the Leuschner family of various sums of money aggregating probably $100,000, and on any view of the evidence a substantial sum, with the result that the plaintiff creditors received on an average about 80 per cent of the contract price for produce they delivered, shows a concerted effort by members of the family to save the solvency of the companies for the benefit of the creditors and themselves. They had a perfect right, of course, to seek to protect themselves when going beyond the call of legal duty to try to save the corporate enterprise. The regrettable situation that, because of a declining canning market and a breach of contract by one of the buyers from the defendant companies, the corporations were unable to pay plaintiffs in full does not in the circumstances warrant a holding that fraud, inequity, or injustice will follow as a result of acts of the Leuschners unless further monies are supplied by them.

In any event, it additionally appears that the defendant Elizabeth F. Leuschner was actually a housewife by occupation who had little knowledge of the affairs of the corporations and no independent direction or control of their business activities, and who only did the bidding of her husband, Richard D. Leuschner, Sr., in the way of executing documents as requested by him.[2] Moreover, during the period when plain-

---

[2]The record shows the following:

"Q. [Of Mrs. Leuschner] What is your occupation? A. Housewife.

"Q. Do you have any other occupation other than that of housewife? A. No. . . .

"Q. Do you have any knowledge of the corporation by the name of Yosemite Creek Company? A. I knew there was one, yes. . . .

"Q. . . . were you one of the incorporators of Yosemite Creek Company? A. According to that, I am, or was.

"Q. Yes, and were you also one of the directors . . . in 1949? A. I don't remember. It should be of record. . . .

"Q. In what business was the Yosemite Creek Company engaged? A. In the canning business.

tiffs' claims arose in 1952 and 1953, Mrs. Leuschner's sole ownership or property interest in the two defendant corporations consisted of one share of Yosemite's stock, and no shares whatsoever of the stock of Kadota. As shown in the opinion prepared by Chief Justice Gibson, various employes of Yosemite also owned eight shares of that corporation's stock. I can perceive no reasonable or fair basis for holding Mrs. Leuschner, a housewife, responsible for the activities and obligations of Yosemite, which she herself did not direct or control and in which she owned only one share of stock, while not holding the stock-owning employes. Consequently, it seems to me, an affirmance of the judgment against her in itself serves to promote injustice and inequity, rather than the contrary.

I would reverse the judgment as to all of the individual defendants.

Shenk, J., concurred.

Appellants' petition for a rehearing was denied March 11, 1959. Carter, J., did not participate therein. Shenk, J., and Schauer, J., were of the opinion that the petition should be granted.

---

"Q. Did you do any processing, selling? A. *I don't know* anything about that part of it. . . .

"Q. Where was the plant located in 1949, Mrs. Leuschner? A. At Kadota out on Yosemite Highway.

"Q. Was the plant and office later moved to Modesto? . . . A. Yes, I think it was.

"Q. *Do you know* about *when* it was moved? A. *No, I do not.* . . .

"Q. . . . did you, as an individual, ever enter into any business transaction, business deal, or arrangements of any kind with Yosemite Creek Company? A. Well, all I did was give money . . . I loaned money to Yosemite Creek Company . . . and I was supposed to get it back. . . . I don't remember the years, but . . . there are records of that. . . . I don't know how much [money] . . ." (Italics added.)

Mr. Leuschner, Sr., testified as follows:

"Q. During this period of time, Mr. Leuschner, in 1953, . . . did you have occasion to actually discuss the business operations and the operation of the Yosemite Creek Company and the Kadota Creek affairs with her [Mrs. Leuschner] to a point where she would know . . . the nature and extent of the business, the activities? A. No.

"Q. In other words, she didn't know, is that right? A. I ran the business."