Filed 8/5/14  Mt. Whitney Farms v. Sandstone Marketing CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MT. WHITNEY FARMS LLC, et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> SANDSTONE MARKETING, INC., <br><br> Defendant and Appellant. | F065715 <br><br> (Super. Ct. No. 08CECG03286) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  M. Bruce Smith, Judge.

Perkins, Mann & Everett, Douglas V. Thornton, Robert W. Branch and Craig A. Tristao for Defendant and Appellant.

LaMontagne & Amador and Eric A. Amador for Plaintiffs and Respondents.

-ooOoo-

Appellant Sandstone Marketing, Inc. (Sandstone) entered into a contract with respondents, Felger Farms and Mt. Whitney Farms (Mt. Whitney).  Felger Farms and Mt.

Whitney were to grow a variety of melons from seeds provided by Sandstone. The crop was unsuccessful and the parties sued each other for breach of contract. Sandstone prevailed at trial and obtained a judgment in excess of $400,000 against Felger Farms and Mt. Whitney.

When Sandstone attempted to levy against Felger Farms and Mt. Whitney, it discovered that its judgment lien was junior to other security interests, including loans from related entities, Cantua Creek Farms (Cantua Creek) and Felger Madera Ranch Cotenancy (Madera Ranch). In response, Sandstone conducted oral examinations and requested documents from the judgment debtors. Thereafter, Sandstone moved the trial court to amend the judgment to add Cantua Creek, Madera Ranch, two family trusts and the individual members of the Felger family as judgment debtors on the ground that they were alter egos of Felger Farms and Mt. Whitney.

The trial court denied the motion finding that Sandstone had not met its burden of establishing the two conditions that must be met before the alter ego doctrine will be invoked. The court also declined Sandstone's request for a statement of decision. The court concluded that its written decision adequately summarized the basis for its ruling.

Sandstone contends the trial court erred in refusing to provide a statement of decision. Sandstone further argues the trial court abused its discretion in denying the motion.

The trial court's findings on the alter ego doctrine are supported by substantial evidence. Moreover, the court's written decision adequately explained the basis for its ruling. Accordingly, the order will be affirmed.

## BACKGROUND

The central issue before this court is whether the trial court properly refused to apply the alter ego doctrine. Whether the business form should be ignored as an alter ego is primarily a question of fact. Therefore, the trial court's finding will not be disturbed

2.

when supported by substantial evidence. (*Toho-Towa Co., Ltd v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108 (*Toho-Towa*).) Accordingly, we must resolve all evidentiary conflicts and draw all reasonable inferences in favor of the trial court's decision. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

## 1. The Felger entities.

### a. Felger Trusts

Joan Felger is the income beneficiary of two family trusts formed in 1984, her revocable trust, the A. Craig and Joan S. Felger First Share Trust and her deceased husband's irrevocable trust, the A. Craig and Joan S. Felger Second Share Trust (Felger Trusts). Joan's children, Warren, Forrest, Carol, Faith, Phyllis and Desiree, are contingent remainder beneficiaries of the Felger Trusts.[1] Joan and Warren are cotrustees.

### b. Cantua Creek

In 1993, Cantua Creek was formed as a general partnership. The partners are the A. Craig and Joan S. Felger Second Share Trust, Joan, and her six children. Warren and Forrest are the managing general partners of Cantua Creek and each own a 9.915 percent capital interest. Cantua Creek owns 948 acres of farm land, some of which is planted to almonds and some of which is planted to row crops.

### c. Felger Farms

Also in 1993, Warren and Forrest formed Felger Farms, a general partnership, with each owning a 50 percent interest. Each partner made an initial capital contribution of approximately $64,000. Felger Farms leases and farms a portion of the Cantua Creek property.

---

[1] Because many of the family members share the same last name, we refer to each by their first name for purposes of clarity. No disrespect is intended.

3.

### d. Madera Ranch

In 1995, Madera Ranch was formed by the Felger Trusts via a tenancy-in-common agreement. Madera Ranch owns 635 acres of land. During 1995, Madera Ranch planted 100 acres to almonds. Felger Farms manages the farming of the almonds but otherwise has no financial interest. Joan receives all the net income from the operation of the almond orchard. The remaining 535 acres of open ground are leased to Felger Farms under a written agreement.

### e. Mt. Whitney

Mt. Whitney, created in 1999, is a California limited liability company. Warren and Forrest are its members with each having a 50 percent interest. Mt. Whitney farms part of Cantua Creek's property under a written lease agreement. Felger Farms has contributed approximately $2.5 million to Mt. Whitney through December 2011 to fund the Mt. Whitney farming operations.

In sum, Cantua Creek and Madera Ranch hold title to land that they lease to Felger Farms and Mt. Whitney. Felger Farms also manages 100 acres of almonds owned by Madera Ranch. Warren and Forrest are the sole owners of Felger Farms and Mt. Whitney, each having a 50 percent share.

## 2. Accounting and finances.

The four business entities, the Felger Trusts, and the individual members of the Felger Family each maintain separate cash basis books and records. Warren maintains the books and records for all of the entities and trusts on an accounting program. Only Felger Farms and Mt. Whitney have bank accounts.

Felger Farms and Mt. Whitney, the active farming operations, maintain their books and records in a single accounting file. However, all items of taxable income and expense are segregated on the books and records by the farming location, i.e., Cantua Creek or Madera Ranch, the farming entity, i.e., Felger Farms or Mt. Whitney, and the

4.

crop year. Thus, each entity maintains a segregated account that is used to produce cash basis income statements.

Both Cantua Creek and Madera Ranch use Felger Farms to manage their leasing and farming operations. As their manager, Felger Farms maintains intercompany accounts for Cantua Creek and Madera Ranch to record each landowner's income and expenses. Felger Farms also uses its employees to provide labor. All of the entities are covered by one insurance policy issued to Felger Farms, and use the same legal counsel and accountants.

Felger Farms and Mt. Whitney maintain operating lines of credit with Tri Counties Bank for their farming and management operations. For the years examined by Sandstone, the crop proceeds were sufficient to pay the annual crop line. Although the loans were made only to Felger Farms and Mt. Whitney, they were guaranteed by Warren, Forrest, the Felger Trusts and Joan. These guarantors were the recipients of the economic returns from the crops grown with the loan proceeds. Cantua Creek also guaranteed some of these loans.

*3.*      *Metropolitan Life refinance and loans to Felger Farms and Mt. Whitney.*

In 2004, Cantua Creek refinanced existing debt by borrowing $2.3 million from Metropolitan Life Insurance Company (MetLife). This loan was secured by Cantua Creek's farmland. Cantua Creek then advanced some of the loan proceeds to Felger Farms and Mt. Whitney. Felger Farms and Mt. Whitney used these proceeds to pay off a third party lender and to develop 155 acres of almonds. In consideration of the last advance made in 2007, Felger Farms and Mt. Whitney gave a $1,439,100 promissory note to Cantua Creek. This note was secured by a security agreement and financing statement. As of December 31, 2010, the balance on this note was $1,286,100.

Another MetLife refinancing occurred in 2011. Both Cantua Creek and Madera Ranch refinanced their secured debt. The 2011 MetLife loan was for $4 million, $1

million of which was available for Felger Farms and Mt. Whitney to develop additional almond acreage.

Cantua Creek and Madera Ranch loaned additional money to Felger Farms and Mt. Whitney out of the 2011 MetLife loan proceeds. Felger Farms and Mt. Whitney signed a new promissory note for $4 million, "or, if less, such amounts as may be advanced" to Felger Farms and Mt. Whitney. This note was dated April 15, 2011, and included as an "event of default" the "entry of a judgment in an excess of" $50,000 against the borrowers. It was also secured by a security agreement and financing statement. As of December 31, 2011, Felger Farms and Mt. Whitney owed $1,662,044 under this note.

### 4. *Sandstone's collection efforts*.

Following trial on the parties' breach of contract claims relating to a dispute over a melon growing agreement, the jury found in favor of Sandstone. An approximately $231,000 judgment against Felger Farms and Mt. Whitney was entered on February 14, 2011. Thereafter, Sandstone was awarded approximately $237,000 in attorney fees and costs.

Sandstone engaged in collection efforts. Felger Farms and Mt. Whitney were ordered for examinations and to produce documents. In August 2011 the trial court issued writs of execution on the bank accounts of Felger Farms and Mt. Whitney. The accounts totaling approximately $36,000 were levied against. However, there were senior third party claims against those assets.

Sandstone then filed the underlying postjudgment motion to add judgment debtors under Code of Civil Procedure section 187. Sandstone alleged that Cantua Creek, Madera Ranch, the Felger Trusts, Joan as trustee of the Felger Trusts, Warren as trustee of the Felger Trusts, and the individual members of the Felger family were the alter egos of Felger Farms and Mt. Whitney.

**5.     *Trial court's ruling on Sandstone's motion to add judgment debtors*.**

The trial court issued a tentative ruling denying the motion. At the hearing on the motion, Sandstone requested a statement of decision beyond the tentative ruling.

The trial court adopted its tentative ruling as the order of the court. The court first noted that two conditions must be met before the alter ego doctrine will be invoked. There must be: (1) a unity of ownership between the business entity and its equitable owner such that the separate personalities do not in reality exist; and (2) an inequitable result if the business entity is not disregarded.

The trial court found that, "[a]t best," Sandstone met its burden of demonstrating unity of interest and ownership as to Warren and Forrest because they were the only owners of Felger Farms and Mt. Whitney. The court further concluded that Sandstone had not submitted any evidence of fraud or injustice or that an inequitable result would follow from respecting the separateness of the family from its entities. The trial court also declined Sandstone's request for a statement of decision finding the tentative ruling adequately summarized the basis for its ruling and provided adequate explanation in the event of further review.

## DISCUSSION

**1.     *Amending a judgment to add a judgment debtor.***

Code of Civil Procedure section 187 authorizes a trial court to amend a judgment to add a nonparty alter ego as a judgment debtor. (*Toho-Towa, supra,* 217 Cal.App.4th at p. 1106; *Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072 (*Misik*).) However, imposing such liability *requires* both (1) that the new party be the alter ego of the old party *and* (2) that due process be satisfied. To satisfy due process, the alter ego must have controlled the litigation and thereby have been virtually represented in the lawsuit. (*Misik, supra,* 197 Cal.App.4th at p. 1072; *Triplett v. Farmers Ins. Exchange* (1994) 24 Cal.App.4th 1415, 1421.) "This is an equitable procedure based on the theory that the

7.

court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant." (*NEC Electronics, Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778.)

The decision to amend a judgment to add a judgment debtor lies in the sound discretion of the trial court. (*Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14, 20.) Sandstone argues the trial court abused its discretion in not amending the judgment to add Cantua Creek, Madera Ranch, the Felger Trusts, the trustees of the Felger Trusts, and the individual members of the Felger family as additional alter ego judgment debtors.

## 2. *Alter ego liability.*

The alter ego doctrine is invoked to disregard a corporate entity and fasten liability on the persons actually controlling the corporation. (*Toho-Towa, supra,* 217 Cal.App.4th at p. 1106.) However, because a corporation is ordinarily regarded as a legal entity separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations, the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*); *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 511 (*Greenspan*).) Society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation. Accordingly, sound public policy dictates that imposition of alter ego liability be approached with caution. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249 (*Las Palmas*).)

Generally, the alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*).) Usually, the plaintiff is seeking to fasten liability on individual stockholders. (*Toho-Towa, supra,* 217 Cal.App.4th at p. 1107.)

However, a plaintiff may seek to disregard a corporate entity when it is organized and controlled and its affairs are conducted so as to make it merely an instrumentality of another corporation. (*Greenspan, supra,* 191 Cal.App.4th at p. 512.) Generally, this type of liability is reserved for the parent-subsidiary relationship. Nevertheless, liability can be found between sister companies under the single-enterprise rule. (*Las Palmas, supra,* 235 Cal.App.3d at p. 1249.) "[W]here there is 'such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal' [citation], the affiliated corporations may be deemed to be a single business enterprise, and the corporate veil pierced. 'Under the "single business enterprise" doctrine, separate corporations may operate with integrated resources in pursuit of a single business purpose.' [Citation.] 'The "single-business enterprise" theory is an equitable doctrine to reflect partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose.' [Citations.]" (*Toho-Towa, supra,* 217 Cal.App.4th at pp. 1107-1108.)

However, regardless of whether the alleged alter ego is based on piercing the corporate veil to attach liability to a shareholder or on holding a corporation liable as part of a single enterprise, common principles apply. (*Toho-Towa, supra,* 217 Cal.App.4th at p. 1108.) In either situation, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and the individual or organization controlling it that the separate personalities do not in reality exist. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 538.) This condition encompasses the proposition that liability will not be imposed on an individual or entity unless that individual or entity has an ownership interest in the subject corporation. (*Riddle v. Leuschner* (1959) 51 Cal.2d 574, 580 (*Riddle*); *Las Palmas, supra,* 235 Cal.App.3d at pp. 1248-1249.) Second, the court must determine that the

failure to disregard the corporate entity will sanction a fraud, promote injustice or cause an inequitable result. (*Misik, supra,* 197 Cal.App.4th at p. 1072.)

Thus, a corporate identity may be disregarded where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 538.) Accordingly, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation. (*Ibid*.) In this way, the alter ego doctrine prevents individuals or other corporations from misusing the corporate laws through a sham corporate entity formed for the purpose of committing fraud or other misdeeds. (*Ibid*.)

Whether the corporate entity should be disregarded is a question of fact. Being based on equitable principles, the conditions under which this can occur vary according to the circumstances of each case. Nevertheless, there are a variety of factors the court may consider. (*Toho-Towa, supra,* 217 Cal.App.4th at p. 1108.) These factors include: the commingling of funds and assets of the two entities; the unauthorized diversion of corporate funds or assets to other than corporate uses; identical equitable ownership in the two entities; use of the same offices and employees; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; identical officers and directors; the failure to adequately capitalize a corporation; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; and the use of one as a mere shell or conduit for the affairs of the other. (*Toho-Towa, supra,* 217 Cal.App.4th at pp. 1108-1109; *Greenspan, supra,* 191 Cal.App.4th at pp. 512-513.) No one characteristic governs. Rather, the court must look at all the circumstances to determine whether the doctrine should be applied. However,

10.

alter ego is an extreme remedy to be sparingly used. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 539.)

### 3.    *The alter ego doctrine and a general partnership.*

As is evident from the above discussion, courts apply the alter ego doctrine to "pierce" entities that otherwise shield their owners from individual liability, e.g., corporations. Nevertheless, here, Sandstone is attempting to apply the alter ego doctrine to a general partnership, Felger Farms, to recover from its partners. However, with certain exceptions, all partners are already liable jointly and severally for all obligations of the partnership. (Corp. Code, § 16306, subd. (a).) Thus, proof of an alter ego is unnecessary to recover against the partners for a partnership's debt. But, while an action may be brought against a partnership and any or all of the partners in the same action or in a separate action, a judgment against a partnership is not by itself a judgment against a partner. Further, a judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against that partner. (Corp. Code, § 16307, subds. (b) and (c).)

Here, Sandstone neither sought nor obtained judgments against Warren and Forrest individually. Thus, as part of its collection efforts, Sandstone seeks to collect from these partners through an alter ego theory. This attempt to circumvent partnership law is questionable at best. Nevertheless, being as the trial court analyzed the alter ego doctrine in the context of a general partnership as part of its ruling, we will do the same.

### 4.    *The trial court's finding of no alter ego liability is supported by the record.*

Sandstone argues the trial court abused its discretion because it did not consider the single business enterprise doctrine when it analyzed alter ego liability. According to Sandstone, all of the family farming entities should be declared one entity that is the alter ego of the Felger family. Therefore, Sandstone asserts, a family member need only own an interest in one entity that is part of the enterprise to be liable as an alter ego for the

11.

debts of Felger Farms and Mt. Whitney despite having no ownership interest in either Felger Farms or Mr. Whitney. Sandstone further contends that, because the Felger family used the entities within the single business enterprise to avoid debt, there was an inequitable result.

As outlined above, the single business enterprise doctrine refers to alter ego liability in the context of one corporation being liable for the debts of another affiliated corporation that is involved in the same business enterprise. Thus, liability flows from a sister corporation being in control of the debtor corporation as opposed to either an individual or a parent corporation being in control of the debtor corporation. In all cases, two personalities, be they individual and corporation, parent and subsidiary, or sister and sister, are handled in such a way as to be considered a single personality for purposes of liability.

However, no matter what the relationship is between the party in control and the debtor corporation, the same two prerequisites must be met. There must be a unity of interest and ownership between the debtor corporation and the individual or organization controlling it so that the separate personalities no longer exist. Further, the court must determine that the failure to disregard the corporate entity will cause an inequitable result. (*Riddle, supra,* 51 Cal.2d at p. 580.) Thus, contrary to Sandstone's position, there is not a separate theory that a trial court must consider in the context of a single business enterprise. It remains a question of ownership and control. Here, the trial court considered the two prerequisites for alter ego liability. It was unnecessary for the trial court to specifically refer to the "single business enterprise doctrine."

### a. Unity of interest and ownership.

Sandstone relies on *Riddle* to support its claim that every Felger family member and entity is an alter ego of Felger Farms and Mt. Whitney. However, Sandstone reads

too much into the *Riddle* court's discussion of the relationship between the individuals and the two corporations in that case.

In *Riddle*, the Leuschner family organized two corporations, Yosemite Creek Company, a fruit and vegetable processor, and Kadota Creek Company, a company that leased and operated farms. Richard Leuschner, Sr. was active in the management of both corporations but did not hold any stock. His wife, Elizabeth Leuschner, held one share of stock in Yosemite. Richard Leuschner, Jr. held stock in both corporations. Riddle, one of Yosemite's creditors, sought to hold the three Leuschners liable for Yosemite's debt as alter egos. (*Riddle, supra,* 51 Cal.2d at pp. 576-578.)

The trial court in *Riddle* found that Yosemite and Kadota were completely controlled, dominated, managed and operated by the three Leuschners, that the corporations were such in name only, that Yosemite's assets were intermingled with Kadota's assets to suit the convenience of the Leuschners, that after such intermingling the corporations were not separate entities but were a single entity operating as Kadota, and that each of the corporations was the alter ego of the Leuschners. Accordingly, the trial court held the individuals were liable for the debts of Yosemite. (*Riddle, supra,* 51 Cal.2d at p. 579.)

The California Supreme Court reversed the judgment against Leuschner, Sr. because, although he managed the companies, he neither owned stock nor had an ownership interest in either of the two corporations. The first prerequisite for alter ego liability was not met. (*Riddle, supra,* 51 Cal.2d at p. 580.) However, the court upheld the alter ego liability judgments against Mrs. Leuschner and Leuschner, Jr. as stockholders. The court stated "[t]he findings that the two corporations were controlled, dominated, managed, and operated by the Leuschners and that there was no separateness between them and the corporations are supported by the evidence set forth above insofar as concerns Leuschner, Jr., and the relationship between Mrs. Leuschner and Yosemite."

13.

(*Id*. at p. 581.)  Thus, the court concluded that Mrs. Leuschner's one share of stock in Yosemite was sufficient to permit holding her personally liable for Yosemite's debts. (*Id*. at p. 580.)  The court further determined that the transfer of Yosemite's assets to Kadota when Yosemite was insolvent operated to the disadvantage of Yosemite and its creditors.  The court found, under these circumstances, the inequity justified disregarding the separate corporate entity.  (*Id*. at pp. 581-582.)

In *Las Palmas*, the court interpreted *Riddle* as standing "for the proposition that it would be unfair to impose personal liability on an individual for corporate conduct unless he had an ownership interest in the company."  (*Las Palmas, supra,* 235 Cal.App.3d at p. 1249.)  This summation is counter to Sandstone's position.

However, the *Las Palmas* court recognized that lack of shareholder status, or any one factor alone, may not end the alter ego inquiry.  In *Las Palmas*, the debtor corporation had been a wholly owned subsidiary of the proposed alter ego defendant but had earlier transferred all of its stock in the debtor corporation to, among others, a sister corporation, while still retaining some control over the debtor.  Under these circumstances, the court held that, despite no longer owning stock in the debtor corporation, it would be unfair to permit the proposed alter ego to escape liability.  (*Las Palmas, supra,* 235 Cal.App.3d at p. 1249.)

Thus, although "[t]here is no litmus test to determine when the corporate veil will be pierced," there still must be a sufficient unity of interest and ownership between the debtor and the proposed alter ego such that their separate personalities can be said to no longer exist.  (*Mesler, supra,* 39 Cal.3d at p. 300.)  In other words, the proposed alter ego must have had, in one way or another, control over the debtor.

The debtors here, Felger Farms and Mt. Whitney, have always been owned and controlled by Warren and Forrest.  None of the other individuals who Sandstone seeks to add as judgment debtors have ever had any ownership interest in, or control over, Felger

14.

Farms and Mt. Whitney. The same is true of the Felger Trusts, Cantua Creek and Madera Ranch. Those entities lease property to the debtors and have hired Felger Farms as a farm manager. There is no evidence of their having had any control over Felger Farms and Mt. Whitney. Accordingly, substantial evidence supports the trial court's finding that, "[a]t best," Sandstone met its burden of demonstrating the first prerequisite for alter ego liability as to Warren and Forrest only.

### b. The equities.

The remaining issue is whether the trial court's finding on the equities is supported by substantial evidence. The burden was on Sandstone to demonstrate either wrongdoing on the part of Felger Farms and Mt. Whitney or injustice flowing from the recognition of these debtors as separate entities. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 539.) "The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form. Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard." (*Ibid.*)

Sandstone argues that the structure of the loans between the Felger entities demonstrates bad faith and is sufficient to justify disregarding the separateness of these business entities. According to Sandstone, Felger Farms and Mt. Whitney use the loans as a shield against obligations.

As outlined above, in 2004 Cantua Creek took out a $2.3 million loan from MetLife secured by its farmland. Cantua Creek in turn advanced money to Felger Farms and Mt. Whitney for the purpose of paying off a third party lender and developing almond orchards. Felger Farms and Mt. Whitney gave Cantua Creek a promissory note in 2007 for approximately $1.4 million. The balance on this promissory note was approximately $1.3 million as of December 31, 2010.

The underlying contract action was filed in September 2008 and the verdict in Sandstone's favor was entered in February 2011.

Cantua Creek refinanced a second time and Madera Ranch refinanced its debt in 2011. Felger Farms and Mt. Whitney signed a new note in April 2011, which was after Sandstone had received its judgment. Although this note was for the amounts advanced by Cantua Creek and Madera Ranch up to $4 million, as of December 2011, the balance was approximately $1.6 million.

Contrary to Sandstone's position, this financial arrangement does not demonstrate manipulation or bad faith. The landowners, Cantua Creek and Madera Ranch, borrow the money from the third party lenders because they own the land to secure these loans. Cantua Creek and Madera Ranch in turn loan money to the active farming operations that lease the land, Felger Farms and Mt. Whitney, so these entities can develop orchards and cultivate other crops. There is no indication that any of the advances were made to Felger Farms and Mt. Whitney with a fraudulent, deceptive or inequitable intent. (Cf. *Sonora Diamond, supra,* 83 Cal.App.4th at p. 539.) Rather, the advances were made to fully functional independent farming entities that farm land for their own account.

Sandstone argues the April 2011 promissory note is evidence of bad faith. Sandstone points out that this note was for the entire $4 million loan amount and was in default the day it was signed because Sandstone already had a judgment against Felger Farms and Mt. Whitney that was in excess of $50,000.

However, at the time Felger Farms and Mt. Whitney executed the April 2011 note, they were already in debt to Cantua Creek and Madera Ranch for approximately $1.3 million. Further, this debt existed before the underlying action was filed. Moreover, although Felger Farms and Mt. Whitney could borrow up to $4 million, the April 2011 note clearly stated it was only for the amounts actually advanced. As of December 31, 2011, Felger Farms and Mt. Whitney owed approximately $1.6 million under this note.

16.

Thus, while the debt increased, it existed before Sandstone filed its lawsuit and obtained its judgment.

In sum, the trial court's finding that Sandstone did not meet its burden of establishing that an inequitable result would follow if Felger Farms and Mt. Whitney were regarded as separate entities is supported by the record. Since Sandstone did not meet both prerequisites required for alter ego liability, the trial court correctly ruled that such liability did not exist. Accordingly, the motion to amend the judgment to add alter ego judgment debtors was properly denied.

Sandstone further argues the trial court abused its discretion when it concluded that the motion was not served on most of the entities sought to be added as judgment debtors. Sandstone further objects to the court's statement that the judgment to which the alleged alter egos were sought to be added was currently on appeal. However, because the trial court went on to rule on the merits of Sandstone's motion, these alleged preliminary errors are moot.

### 5. The court's tentative ruling satisfied Sandstone's request for a statement of decision.

At the hearing on the motion to add judgment debtors, Sandstone requested a statement of decision from the trial court. In adopting its tentative ruling as the order, the court declined Sandstone's request for a formal statement of decision on the ground that the tentative ruling adequately summarized the basis for the court's ruling and provided adequate explanation in the event of further review. Sandstone argues the trial court's failure to provide a separate statement of decision is reversible error.

Generally, a statement of decision is not required after a ruling on a motion. (*Gruendl v. Oewel Partnership, Inc.* (1997) 55 Cal.App.4th 654, 660.) Nevertheless, there are exceptions to this rule where, on balancing "'(1) the importance of the issues at stake in the proceeding, including the significance of the rights affected and the

17.

magnitude of the potential adverse effect on those rights; and (2) whether appellate review can be effectively accomplished even in the absence of express findings'" the court determines a statement of decision is necessary. (*Ibid*.) In *Gruendl*, the court concluded that a ruling granting a motion to add a judgment debtor as an alter ego was such an exception. (*Id*. at p. 661.)

A statement of decision must explain the factual and legal basis for the court's decision as to each of the principal controverted issues at trial. (Code Civ. Proc., § 632.) However, the court is not required to make an express finding of fact on every disputed factual matter. Rather, a statement of decision is sufficient if it adequately disposes of all the basic issues in the case. (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 763.) The court need only fairly disclose its determinations as to the ultimate facts and material issues in the case. (*Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 689.)

The parties disagree on whether a statement of decision was necessary here, where, unlike the ruling in *Gruendl*, the motion to add judgment debtors was denied. However, we need not decide this issue because the trial court in effect adopted its tentative ruling as its statement of decision and thus satisfied Sandstone's request.

Sandstone argues that, even considering the tentative ruling as a statement of decision, it is entitled to a reversal because the statement of decision was inadequate. Sandstone asserts that the trial court's discussion of service of the motion and personal jurisdiction and the impact of the then pending appeal is insufficient. However, as discussed above, these preliminary matters are moot because the court ruled on the motion on the merits.

Sandstone further contends that the trial court did not adequately dispose of all of the issues in the case. Rather, Sandstone argues, the ruling is vague and ambiguous as to

whether Warren and Forrest were alter egos and as to whether an inequitable result would follow.  Sandstone also objects to the term "Felger family" being undefined.

Contrary to Sandstone's position, the trial court adequately disposed of the basic issues in the case.  The court found that the only possible alter egos were Warren and Forrest and, even assuming they met the alter ego criteria, Sandstone had not demonstrated a fraud or injustice.  Further, in the context of Sandstone's motion and the parties involved, there is no confusion regarding the term "Felger family."  Finally, the trial court's adoption of its ruling as a statement of decision has not impeded appellate review.  Accordingly, the trial court's statement of decision was sufficient.

## DISPOSITION

The order is affirmed.  Costs on appeal are awarded to respondents.

_____
LEVY, J.

WE CONCUR:


_____
HILL, P.J.


_____
KANE, J.

19.