[Civ. No. 32169.   Second Dist., Div. One.   Aug. 8, 1968.]

MARIE THERESA MONTELEONE, Plaintiff and Respondent, v. SOUTHERN CALIFORNIA VENDING CORPORATION, Defendant and Appellant.

Loeb & Loeb and Robert A. Holtzman for Defendant and Appellant.

Ross & Saunders and E. Loyd Saunders for Plaintiff and Respondent.

FOURT, J. — Southern California Vending Corporation (hereinafter sometimes referred to as Southern California Vending) appeals from a judgment determining that the corporation is bound as lessee under a 10-year lease for building premises owned by Mrs. Marie Theresa Monteleone.

Mrs. Monteleone as owner of property at 2201 North Figueroa Street in Los Angeles instituted the subject action for "Declaratory Relief and Breach of Contract" to obtain an adjudication that Southern California Vending occupied the premises subject to the terms of a valid lease and a judgment in damages for breach thereof. The trial court found that although Willard R. Ausmus, who purportedly executed the lease on behalf of the corporation, was at the time neither agent nor employee of Southern California Vending, he subsequently became general manager and vice president of that corporation, with authority to bind the company which thereafter confirmed the 10-year lease obligation.

Appellant contends that Southern California Vending did not ratify the lease because (a) there was no written ratification (Civ. Code, § 2310), and (b) the acts relied upon as evidence of corporate ratification were performed while the corporation had no knowledge of the existence of the lease or its terms and conditions. Appellant further contends that, in

any event, any prior ratification of the lease had been rescinded (Civ. Code, § 2314) and that the lessor may not rely upon her own negligent failure to ascertain the existence and scope of Ausmus' authority in order to establish the validity of the lease. These contentions are without merit.

It was disclosed at the trial that on or about May 11, 1965, Willard R. Ausmus visited the then vacant premises at 2201 N. Figueroa for which Mrs. Monteleone desired to obtain a tenant. Ausmus was accompanied by his secretary, Mrs. Perea, and her husband, a carpenter. Mrs. Monteleone showed them the building and they carefully examined the interior and exterior to determine what changes might be required to render the space suitable for their intended business purposes. Ausmus inquired whether Mrs. Monteleone would object if they should tear down partitions, build upstairs rooms, and construct a door in the side of the building. He also inquired whether she would be willing to demolish the house on the adjacent lot, which she also owned, and to prepare a macadam parking lot there for the use of the proposed new tenants. Mrs. Monteleone agreed to the remodeling and thereafter reluctantly consented to evict the tenant from the adjacent house and demolish the building to create a parking lot on the property, in return for a 10-year lease agreement with the new tenants.

According to the understanding then reached, a written form lease for a 10-year term was prepared and executed by ''W.R. Ausmus—Pres.'' purportedly acting on behalf of ''Southern California Vending Inc.'' In fact, at the time Ausmus executed the lease, he was not the agent of Southern California Vending; he did not have actual, apparent or ostensible authority to execute a lease for the corporation, and he was neither an officer nor an employee of the corporation, the proper name of which was ''Southern California Vending Corporation.'' However, Ausmus testified that he and one or more proposed business partners had entered negotiations to purchase from the parent company, Seeburg Corporation, the vending business of Southern California Vending. The transaction was still pending and therefore, although Ausmus on May 11, 1965, or shortly thereafter, signed the lease in the manner indicated above, he left no executed copies with Mrs. Monteleone. Instead, Ausmus told her that he wanted to take the lease with him when he would visit Jack Gordon, presi-

dent of Seeburg Corporation, in Chicago the end of May, and he would mail her a copy of the lease thereafter.

The original purchase negotiations terminated unsuccessfully, but Ausmus testified that while he was in Chicago he was hired by Jack Gordon as vice-president of Southern California Vending and general manager of its local vending route operations with authority to commence his new responsibilities on June 1, 1965. Gordon gave Ausmus complete control with directions to clean house and run the corporation like a vending company. In order to assure that there would be no misunderstanding with local personnel, Gordon signed and delivered to Ausmus a letter dated May 28, 1965, which stated: "To whom it may concern: This is to advise that effective June 1, 1965, Willard Ausmus is appointed vice-president and general manager of the Southern California Vending Corporation." When Ausmus advised Gordon that he was going to rent other premises for the company, Gordon gave him authority to use his own judgment. Ausmus' appointment as vice president was officially confirmed by the board of directors on June 15, 1965.

Meanwhile, on or about June 1, 1965, Ausmus returned to Los Angeles where he proceeded as general manager of Southern California Vending to purchase trucks and equipment, hire and fire employees who worked for and were paid by the company, and Southern California Vending started extensive remodeling of the leased premises which included tearing down walls, putting up new partitions, and constructing a loading dock. Mrs. Monteleone on her part paid $85.99 for plumbing work required by the company, evicted the tenant from the house on the adjacent lot, paid that tenant's final utility bills, and paid $500 to have the house demolished (thereby losing $110 per month rental income) and $970 to have the lot paved. On June 17 Ausmus sent a company truck to help move the evicted next-door tenant to make way for construction of the parking lot. The second week in June, Southern California Vending moved into their new offices and Mrs. Monteleone obtained from Ausmus an executed copy of the written lease which had never been mailed to her.

The corporate officers in Chicago were notified in early June 1965 that the company had moved into its newly remodeled headquarters on North Figueroa Street and thereafter mail from the home office was sent to that address. They were further advised that extensive alterations of the building were

under way and the ultimate cost of this remodeling was approximately $5,000. In early June, also, Mr. Bright, the controller of Southern California Vending, at Ausmus' direction wrote and signed a check intended to represent the deposit called for in the lease, which was the sum of one month's current rental ($600 per month) and the rent for the last two months of the lease (at $800 per month). Because the check was written for $2,400 instead of the correct amount of $2,200, Bright shortly thereafter was notified by Mr. Peake, Mrs. Monteleone's accountant, that the amount of the deposit was incorrectly computed pursuant to the terms of the lease. Bright thereafter, according to agreement, recouped the difference by paying only $400 for the July rental instead of the $600 called for by the lease. The officers of the company later testified that Ausmus was in reality made general manager and vice president pending the anticipated purchase of the company by another group, which also included Ausmus, and that his authority was expressly limited to the rental of new premises on a month-to-month tenancy. However, when questions arose about the arrangements for occupancy of the Monteleone property, Ausmus explained to the other corporate officers that he had secured a month-to-month tenancy with a two-month guaranteed rental pending the time he and his associates should complete the purchase and enter a long-term lease with the owner.

When the second series of purchase negotiations terminated unsuccessfully, and it became apparent to the corporate officers in Chicago that Southern California Vending, which had been operating for sometime at a deficit, would continue to lose money, Ausmus was discharged. On July 23, 1965, the company terminated his engagement as vice president and general manager and placed Terry Morrissey in charge of vending route operations. The corporation did not have actual knowledge of the existence of the lease or of its terms until Bright was once again contacted by Peake in early August to tell him that the August rent had not been received. Bright responded that although the check was prepared, it had not been sent because Ausmus had left the company and no one else knew Mrs. Monteleone's address. In the course of their conversation Peake clearly informed Bright that the lease existed, and that Mrs. Monteleone had agreed to and completed substantial modification of the premises, had consented

to building alterations, and had demolished an adjacent house for parking in accordance with the lease agreement. The controller thereafter sent to the lessor the $600 check for the August rent, and arranged a meeting between himself, Morrissey, Peake, and Mrs. Monteleone to review the written lease and discuss the situation.

At this meeting in early August of 1965, the Southern California Vending officers rejected Mrs. Monteleone's claim that the company was obligated by the lease, indicated that the company was operating at a deficit and could not afford that obligation, and offered to pay Mrs. Monteleone the expenses she had incurred in modifying the property and to occupy the premises thereafter on a month-to-month tenancy at an increased rental of $800 per month. The evidence concerning her response to this offer is not altogether clear. Apparently Peake advocated acceptance and suggested that Mrs. Monteleone bring him her bills. Mrs. Monteleone, however, testified that while she agreed to bring in the bills, she did not consent to the proposed modification of the terms of tenancy. Southern California Vending nonetheless thereafter tendered rental payments of $800 for each successive month of occupancy up to July 1966. At that time they vacated the premises and at the time of trial they no longer had an operating office in Southern California. Mrs. Monteleone rejected these tendered payments and appellant therefore placed these sums, upon rejection, in an account in her name at a local bank (Civ. Code, § 1500) where they have remained to the present time.

It is conceded that Mrs. Monteleone, at the time she agreed to rent the property to Ausmus, purportedly acting on behalf of Southern California Vending, relied upon her accountant's investigation and made no independent investigation of Ausmus' authority. She did not request that the lease be acknowledged, nor did she require that it bear either the signatures of two corporate officers or the corporate seal, and she did not request a copy of the corporation resolution authorizing the lease. Peake, however, did investigate both Ausmus and the company. He verified that the company was a bona fide business organization with a Los Angeles office, that Ausmus was known to company employees at that office, and that the company had entered into and was performing certain 10-year contracts with the County of Los Angeles. Neither Peake nor Mrs. Monteleone demanded an explanation of the discrepancies in the corporate name, or the difference in Ausmus'

title as he signed the lease and as it appeared on his business cards.

Substantial evidence supports the findings of the trial court that, although Ausmus had neither actual, apparent or ostensible authority to act for the appellant at the time he signed the lease during May 1965, he thereafter became and was from June 1 to July 23, 1965, both general manager and a vice president of Southern California Vending, in charge of its vending route operations. Although he was expressly instructed by his superior officers not to enter any leases other than tenancies from month to month, he nonetheless thereafter, and during the period when he had authority to act, caused appellant to occupy the subject premises, to complete improvements to the premises at a cost of $5,000, and to make the deposit and rental payments called for by the lease. Ausmus represented to appellant's other officers that appellant occupied the premises on a month-to-month tenancy, only, with a guarantee of two month's additional rent, and appellant had no actual knowledge of the lease or any of its terms and conditions until August 4, 1965, when the controller obtained a copy, but he thereafter sent to respondent the August rental check for $600, as provided in the lease.

The trial court determined that Southern California Vending was, nonetheless, charged with constructive knowledge of the lease and its terms and conditions by reason of the following facts known to or disclosed to its officers and employees (other than Ausmus) during June and July 1965, and by virtue of the authority conferred on Ausmus by the company to act in its behalf after June 1, when he actually delivered the lease to Mrs. Monteleone: Ausmus had the appellant's vending machine route operations moved to the demised premises and commenced conducting business from there; he caused the corporation to make the rental payments above described, and he caused the tenant to make improvements costing approximately $5,000 to the demised premises. The court further found that Ausmus did obtain and have actual authority on June 1, 1965, and that he did thereafter affirm the lease. The trial court thus determined that Ausmus, although having no authority to act as an agent of Southern California Vending prior to June 1, 1965, thereafter completed a valid lease agreement with Mrs. Monteleone at a time when he had the authority and capacity to act, not as an agent, but directly for the corporation. His conduct was ac-

cepted and the lease was, in effect, ratified by the corporation which had constructive knowledge and was on notice that a lease existed, because it made a substantial security deposit and extensive alterations in the premises, continued to occupy the premises and to make rental payments after learning of the existence of the lease.

Appellant first contends that an agent must have written authority to sell or lease real property, hence the ratification of the agent's unauthorized sale or lease must also be in writing (Civ. Code, § 2310), and since in this instance the company did not affirm the lease in writing there was no valid ratification. "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." (Civ. Code, § 2309.) However "Corporations can act only through the agency of natural persons, and it has been held that the authority of an agent of a corporation need not be in writing, so far as the statute of frauds is concerned." (*Carrier* v. *Piggly Wiggly of San Francisco*, 11 Cal.App.2d 180, 182-183 [53 P.2d 400].) For similar reasons, the provisions of Civil Code sections 2309 and 2310 have no application to the acts of an executive officer of a corporation, who is more than an agent and acts and speaks directly for the corporation in conducting its activities and objects. (*Jeppi* v. *Brockman Holding Co.*, 34 Cal.2d 11 [206 P.2d 847, 9 A.L.R.2d 1297].) Moreover, Ausmus was both general manager and vice president, and it is well established that the general manager has implied authority to bind the corporation and do in the transaction of its ordinary affairs whatever the corporation itself could do within the scope of its powers. (*Pacific Concrete Products Corp.* v. *Dimmick*, 136 Cal.App.2d 834, 838 [289 P.2d 501]; *Greig* v. *Riordan*, 99 Cal. 316 [33 P. 913].) Therefore, Ausmus completed with full authority the lease transaction that he preliminarily entered without such power. "The execution of an instrument is the *subscribing and delivering* it, with or without affixing a seal." (Code Civ. Proc., § 1933.) (Italics added.) "It is, of course, elementary that delivery of an instrument is a prerequisite to its validity and its binding effect upon the party signing the same. Without delivery it is a mere scrap of paper and is ineffective for any purpose. [Citations.]" (*Hudemann* v. *Dodson*, 215 Cal. 3, 6 [7 P.2d 997].)

Appellant's second contention is that, assuming acts of ratification by the corporation, this conduct took place at a time when the company had no knowledge of the terms and conditions of the lease, and ratification of the previously unauthorized acts of an agent can only take place when the principal has full knowledge of the facts and the principal's rights. (*Hutchinson* v. *Scott, Magner & Miller*, 35 Cal.App. 171 [169 P. 415] ; *Hogan* v. *Neighbor's Lbr. Yard, Inc.*, 108 Cal.App. 495 [291 P. 603].) A complete answer to this contention is the circumstance that Ausmus was clothed at the time the lease was delivered to Mrs. Monteleone with full authority to execute the document, subject to limitations not communicated to her and of a nature not reasonably within her contemplation. Moreover, the court found on substantial evidence that at the time the corporation accepted the benefits of the lease, the circumstances were such that it was bound to have notice and constructive knowledge concerning the existence thereof. It was disclosed to other corporate officers that the company was moving its vending route operations to a new location, that a substantial deposit was required to secure the premises, and that extensive alterations to construct heavy loading docks and a strongroom in which to store coins and money, among other things, were being accomplished to accommodate the building to this special purpose use. It would not be reasonable to presume that any business would commit substantial rental deposit, moving, and remodeling costs without the security of a long-term lease. The corporation retained the benefits and cannot now successfully urge that it is bound only to the extent of the undisclosed limitations on Ausmus' authority. (*Lang* v. *Pacific Brewing, etc. Co.*, 44 Cal.App. 618, 622-623 [187 P. 81].)

But appellant contends that a ratification made under a misapprehension of the full scope of the act thus affirmed may be rescinded (*Sanders* v. *Magill*, 9 Cal.2d 145 [70 P.2d 159]) and that it has actually rescinded. This argument has no application to this case where Ausmus had actual authority when the lease was delivered. Moreover, it assumes a prior valid ratification and affirmance of that lease. Since facts known to an officer and facts communicated to a corporation which should place it on notice of the existence of a particular condition place those circumstances within the constructive knowledge of the corporation, it cannot be said that the ratification was made without knowledge. Moreover, there was no

rescission because the company, although seeking to avoid the long-term obligation, nonetheless retained possession and continued to make monthly payments attributable to its occupancy of the premises. The proposition asserted by appellant would give corporations a business advantage over individuals who would be forced to deal with one corporate officer at their peril that another officer might accept without full cognition and thus provide the corporation with an avenue to escape its reasonable obligations.

■ Finally, appellant contends that Mrs. Monteleone is attempting (and should not be allowed) to take advantage of her own negligence and failure to investigate and determine the nature and extent of Ausmus' authority. As we have herein determined, however, Ausmus ultimately obtained and had authority to complete the lease transaction. If he engaged in dishonest representations as to the extent of such authority, to the detriment of others, the consequences must be borne by the corporation which placed him in a position to do so. ■ As between two innocent persons, one of whom must suffer, the loss should fall on the principal who has appointed the agent rather than on the third person who trades or deals with the agent. (*Gaine* v. *Austin,* 58 Cal.App. 2d 250, 262 [136 P.2d 584] ; Civ. Code, § 3543.)

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

On August 26, 1968, the opinion was modified to read as printed above.