Sam KAGEL and John Kagel, as Trustees of the Estate of San Francisco & Oakland Helicopter Airlines, Inc., Debtor Corporation in Proceedings Under Chapter X of the Bankruptcy Act, Plaintiffs,

v.

FIRST COMMONWEALTH COMPANY, INC., a corporation, et al., Defendants.

No. C–70–2689 ACW.

United States District Court, N. D. California.

Sept. 5, 1973.

Steinhart, Goldberg, Feigenbaum & Ladar, Michael R. Marron and James E. Reed, San Francisco, Cal., for plaintiffs.

**1398**

Rodney Robertson, Palm Springs, Cal., McCormack, Davis & Lohr-Schmidt, Newport Beach, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO F.R.CIV.P. RULE 52(a).

WOLLENBERG, District Judge.

### INTRODUCTION

This is an action by Trustees in Bankruptcy for San Francisco and Oakland Helicopter Airlines (hereinafter "SFO") against First Commonwealth Company, Inc. (hereinafter "First Commonwealth") and its principal officers and stockholders, Donald D. Smith, William G. Kimball, and Paul C. Knauff. Jurisdiction is conferred by § 2(a)(7) of the Bankruptcy Act. (11 U.S.C. § 11(a)(7). Plaintiffs allege that a series of letters and discussions during April 1970 resulted in a contract by which First Commonwealth agreed to purchase from SFO all the issued and outstanding capital stock of Larkin Speciality Manufacturing Company, Inc. (hereinafter "Larkin"). Plaintiffs also claim that defendants breached this contract, that First Commonwealth is the mere "alter ego" of the individual defendants and the individual defendants should, therefore, be held personally liable for damages suffered by SFO, and that defendant Donald D. Smith fraudulently misrepresented the financial status of First Commonwealth to a credit reporting agency in order to induce SFO to enter into the contract.

### CONTRACT FORMATION

Defendants first contend that no contract between them and SFO ever existed. They use four different arguments to reach this conclusion, and the Court rejects all of them.

*Late Acceptance*

■ Defendants claim that SFO failed to accept before First Commonwealth's offer expired. Defendants submitted to SFO two offers to purchase Larkin, each dated April 10, 1970, and each specifying that it was to remain effective for one week. The second of these offers (hereinafter "defendants' offer") was ultimately accepted. SFO's acceptance letter (hereinafter "acceptance letter") is dated April 17, 1970, and, as was SFO's practice, was transmitted to First Commonwealth on the same day. Cal.Civ. Code § 1583 provides that an offer to enter into a contract is accepted "as soon as the party accepting a proposal has put his acceptance in the course of transmission to the proposer . . . ." SFO's acceptance letter fully complied with this requirement and, therefore, must be deemed an acceptance of First Commonwealth's offer.

*Rejection and Counter Offer*

■ Defendants next claim that SFO's acceptance letter contains numerous terms not embodied in First Commonwealth's offer and that it is, therefore, not an acceptance at all but must be considered a rejection of the offer and a counter offer proposing new terms.

On the morning of April 17, 1970, before defendants' offer had expired, William G. Kimball, acting for First Commonwealth, met with officials of SFO, and the parties agreed to the final terms of sale. As reflected by SFO's acceptance letter and by Kimball's letter of April 17 to John Woods, of Commonwealth National Bank, the terms of the final agreement included those of First Commonwealth's offer plus some additional terms agreed upon during the meeting of April 17 and recorded in an attachment to SFO's acceptance letter.

The terms contained in the attachment to SFO's acceptance letter are, therefore, not additional proposals which would constitute a rejection and counter offer, but are an integral part of the offer and acceptance. Although agreement to those terms was arrived at orally, the testimony supports the conclusion that the attachment to SFO's letter was actually written by or at the direction of Kimball, who was acting for First Commonwealth. The attachment and the signed offer of April 10, when considered

together, constitute a written memorandum which is sufficient to satisfy the requirements of the Statute of Frauds.

> [S]everal papers, only one of which is signed by the party to be charged, may be considered together to constitute an adequate memorandum of the contract [and] [p]arol evidence is admissible to show the connection of the several papers.

*Karl v. JeBien,* 231 Cal.App.2d 769, 772, 42 Cal.Rptr. 461, 463 (1965). Defendants' offer and SFO's acceptance letter, when read together, record the terms upon which the parties reached agreement for the purchase of Larkin.

*Illusory Contract*

▓▓▓▓ Defendants urge that the alleged contract is unenforceable because it is illusory. They base this conclusion on the following argument:

1) Defendants' offer of April 10 was made subject to the condition precedent of a "satisfactory equipment appraisal".

2) Whether or not the equipment appraisal was satisfactory was a matter solely within the judgment of defendants, subject only to the requirement that that judgment be exercised in good faith.

3) Contracts which make liability contingent solely on the good faith exercise of judgment by one party are illusory and unenforceable.

The Court rejects this argument because defendants misstate the law properly to be applied to this case. The recent case of *Kadner v. Shields,* 20 Cal. App.3d 251, 97 Cal.Rptr. 742 (1971), correctly states the law in California regarding this matter. Whether or not the equipment appraisal was satisfactory must be determined by reference either to the subjective standard of defendants' judgment exercised in good faith or to the objective "reasonable man" standard. Which standard is applied depends on the actual or constructive intent of the parties. In the absence of an expressed intent, there is a judicial preference for the more flexible and less harsh objective test.

Defendants' offer dated April 7, 1970, states that the "offer is contingent only upon *a satisfactory equipment appraisal which would support the book values reported to us by the Larkin financial statements* which have been furnished to us". (emphasis supplied). This offer was rejected and subsequent offers were made "contingent on a satisfactory equipment appraisal". The language used in the offer of April 7 demonstrates that the parties intended the book values of the equipment, as reported by the Larkin financial statements, to constitute an objective standard for determining whether the equipment appraisal was satisfactory.

Even if the Court were to find no expression by the parties concerning an objective standard for determining whether the equipment appraisal was satisfactory, the result would be the same because of the judicial preference for applying an objective standard, particularly where, as here, factors of commercial value and financial concern are involved. The testimony is persuasive that the book value of the machinery as indicated in Larkin's financial statements was intended to be used to determine whether the equipment appraisal was satisfactory. If defendants intended that a standard not previously recorded would apply they could have so specified in their offer of April 10.

The Court concludes that it was a condition precedent to the formation of a contract that an appraisal of the Larkin equipment support the value assigned that equipment in Larkin's financial statements. Since the appraisal valued the equipment at $204,956, and Larkin's financial statements listed its worth at $208,388, the condition precedent was satisfied.

*Written Corporate Authorization*

▓▓ Finally, defendants claim that the contract is unenforceable because Kimball did not have written authorization from First Commonwealth to enter into the contract. Defendants base their

claim on Cal.Civ.Code § 2309, which provides that

> an authori[zation] to enter into a contract required by law to be in writing can only be given by an instrument in writing.

While that section limits the extent to which an agent can act for his principal, it has been held that, because corporations can only act through their agents, § 2309 is inapplicable to acts performed by executives of a corporation in the name of their corporation. Cal.Civ.Code § 2309 has

> no application to the acts of an executive officer of a corporation, who is more than an agent and acts and speaks directly for the corporation in conducting its activities and objects.

*Monteleone v. Southern California Vending Corp.*, 264 Cal.App.2d 798, 806, 70 Cal.Rptr. 703, 708 (1968). See also *Jeppi v. Brockman Holding Co.*, 34 Cal.2d 11, 17, 206 P.2d 847 (1949).

At all times during negotiations between SFO and First Commonwealth, Kimball acted in his executive capacity as Executive Vice President of First Commonwealth. Both offers dated April 10, 1970, are on First Commonwealth letterheads. They both indicate Kimball's executive title beneath his signature, and both letters begin with "First Commonwealth Company, Inc., or an affiliated company, hereby offers to purchase . . . ." Kimball was clearly acting in his corporate capacity and, therefore, required no written authorization from First Commonwealth to enter into a contract with SFO for the purchase of Larkin.

## PIERCING THE CORPORATE VEIL

 Plaintiffs ask that the Court "pierce the corporate veil" of First Commonwealth, and that defendants Smith, Kimball, and Knauff be held personally liable for whatever damages SFO suffered because of First Commonwealth's breach. Before reaching this result the Court must find, first, that there is such a unity of interest and ownership among the individual defendants and First Commonwealth that the separate personalities of the corporation and the individuals no longer exist, and, second, that under the circumstances of this particular case failure to "pierce the corporate veil" would lead to an inequitable result. *Riddle v. Leuschner*, 51 Cal.2d 574, 580, 335 P.2d 107 (1959); *Automotriz, etc. v. Resnick*, 47 Cal.2d 792, 796, 306 P.2d 1 (1957).

In the present case there is ample evidence of the requisite unity among the individual defendants and First Commonwealth to support the conclusion that First Commonwealth is the "alter ego" of Smith, Kimball, and Knauff. These individuals are at once the officers, directors and shareholders of First Commonwealth. In their trial brief defendants describe the corporation as having "been used by Mr. Smith and his shareholders for many years for certain *personal and private ventures*". (emphasis supplied). Evidence was presented at trial showing that corporate funds were used to pay a number of the individual defendants' personal expenses, including income taxes, property taxes and stock purchases.

Whether recognition of the corporate entity of First Commonwealth will lead to an inequitable result is a matter governed by equitable considerations, and conduct short of actual fraud can support a finding that defendants' activity justifies holding them personally liable. See *Linco Services, Inc. v. DuPont*, 239 Cal.App.2d 841, 844, 49 Cal.Rptr. 196 (1966); *Claremont Press Pub. Co. v. Barksdale*, 187 Cal.App.2d 813, 817, 10 Cal.Rptr. 214 (1960). Defendants knowingly used their thinly capitalized corporate entity, First Commonwealth, to enter into obligations which they could not perform. It would be inequitable to impose on the creditors of SFO the losses generated by the defendants' actions. Defendants' conduct in operating First Commonwealth and in representing it to those with whom they dealt provides adequate evidence of bad faith to justify ignoring the corporate entity and attach-

ing personal liability to the individual defendants. While this conduct falls short of actual fraud, it includes the kind of dealings which would make it inequitable for this Court to recognize the corporate entity of First Commonwealth and thus permit the individual defendants to escape personal liability.

## FRAUD BY SMITH

 Finally, plaintiffs contend that defendant Donald D. Smith acted fraudulently when he told a representative of Dun & Bradstreet that the net worth of First Commonwealth was in the neighborhood of five million dollars. The testimony and other evidence support the conclusion that Smith made this statement knowing it to be false and that SFO justifiably relied on it by entering into the contract to sell Larkin. Although the statement was not made directly to SFO officials and may not have been made with the specific intent that it be communicated directly to SFO or that SFO rely on it, nevertheless, Smith knew the information would be recorded in a document which would be circulated among persons who would rely on it in dealing with First Commonwealth.

Allegations of fraud can be proved by a showing that the accused made misrepresentations of financial worth to a credit reporting agency:

> [I]f the company is one whose ratings purport to show the general financial position of those who make reports to it, the maker of the misrepresentation is subject to liability to anyone who in reliance upon the ratings deals with him in any one of the ways in which the maker's financial position is material.

Restatement of Torts § 533, comment *d* at 80 (1938). See also Witkin, *Summary of California Law,* Torts § 199 at 1385–86 (1960).

Smith's conduct was not so malicious, however, as to evidence a motive to injure and, therefore, does not justify an award of punitive damages. *Wolfsen v. Hathaway,* 32 Cal.2d 632, 647, 198 P.2d 1 (1948); *Ebaugh v. Rabbin,* 22 Cal.App.3d 891, 894–95, 99 Cal.Rptr. 706 (1972).

## DAMAGES

 In the case of the breach by a purchaser of a contract for the sale of personal property, the seller's damages are determined by the difference between the contract price and the value of the property to the seller as of the date of the contract's breach. By statute, the value of the property to the seller may be determined "at such time after the breach of the contract as would have sufficed, with reasonable diligence, for the seller to effect a resale". Cal. Civ.Code § 3353. Plaintiffs exercised appropriate diligence in attempting to locate a new buyer for Larkin after defendants' breach and ultimately in the sale of Larkin's assets and in the liquidation of its receivables. Plaintiffs are, therefore, entitled to judgment in the amount of the losses suffered because of the breach. See Cal.Civ.Code § 3300. The damages sustained by plaintiffs as the result of defendants' breach of contract were established at trial to amount to $236,383, the difference between the contract price of $356,383 and the $120,000 realized from the sale of Larkin's assets and the liquidation of its receivables. Plaintiffs are, therefore, entitled to a judgment for $236,383, plus interest, on that amount from the date this action was commenced.

This Opinion shall constitute the findings of fact and conclusions of law pursuant to F.R.Civ.P. Rule 52(a). Plaintiffs will prepare and submit a judgment.