David J. ULLOA, Richard F. Ulloa and Johnny Guevara Sablan, Plaintiffs-Appellants,

v.

GUAM ECONOMIC DEVELOPMENT AUTHORITY, a Public Corporation, and Lee M. Holmes, Defendants-Appellees.

Robert E. HALSEY, Joan M. Halsey and Richard G. Cruz, Plaintiffs-Appellants,

v.

GUAM ECONOMIC DEVELOPMENT AUTHORITY, a Public Corporation, and Lee M. Holmes, Defendants-Appellees.

Nos. 77-2509, 77-3538.

United States Court of Appeals, Ninth Circuit.

Aug. 16, 1978.

Robert D. Wyatt (argued), John A. Bohn (argued), Agana, Guam, for plaintiffs-appellants.

George T. Okamura of Damon, Shigekane, Key & Char, Honolulu, Hawaii, for David J. Ulloa et al.

J. Bradley Klemm (argued), of Klemm, Dear & Lawrence, Agana, Guam, and Vernon F. L. Char (argued), Damon, Shigekane, Key & Char, Honolulu, Hawaii, for Robert E. Halsey et al.

Before CHAMBERS and WALLACE, Circuit Judges, and WONG,* District Judge.

WONG, District Judge:

Appellants in consolidated Case Nos. 77–2509 and 77–3538 are six of the 16 former shareholders of Marianas Communications Systems, Inc. ("MCS"), a Guam corporation founded in 1968 for the purpose of establishing a cable television system for Guam and the Northern Marianas.[1] By 1969, the

---

* Honorable Dick Yin Wong, United States District Judge, District of Hawaii, sitting by designation.

1. The six Appellants are Robert and Joan Halsey, Richard Cruz, David Ulloa, Richard Ulloa, and Johnny Sablan. Most of the remaining 10 former shareholders assigned their interests in the action below and in any MCS stock to D. Ulloa in September and October of 1974. See C.T. 403–409. By Order filed April 18, 1975, nine of these remaining 10 shareholders were dismissed by the trial court for lack of prosecution. In its Opinion, the district court also found that on August 1, 1971, Robert and Joan Halsey sold their entire interest in any MCS shares to Richard Cruz. See C.T. 693, 406.

corporation was in need of extra funds, and the officers and shareholders of MCS sought to obtain the additional financing from the Guam Economic Development Authority ("GEDA"), an incorporated government agency created for the purpose of stimulating economic growth in the Territory of Guam. GEDA ultimately agreed to guarantee a loan in the amount of $200,000 obtained by MCS from the Guam offices of the First National City Bank ("FNCB").

Throughout the years 1971 and 1972, MCS continued to experience severe financial difficulties. After the failure of at least two attempts by MCS to obtain needed capital from outside corporations, MCS once again turned to GEDA. By a Stock Purchase Agreement dated May 21, 1971, each of the MCS shareholders agreed to sell, for a nominal consideration, all of the issued MCS stock to GEDA, who was in turn to assume all of the outstanding obligations of MCS and attempt to transform MCS into a viable enterprise. Section 6 of the Stock Purchase Agreement prohibited GEDA from transferring, alienating or in any way disposing of any MCS shares unless such shares were first offered for sale to the original 16 MCS shareholders. The shareholders' right of first refusal was set at a purchase price equal to the total amount of money expended and incurred by GEDA in the operation of the company.

By a supplemental Agreement also entered into on May 21, 1971, each of the MCS shareholders and GEDA agreed that notwithstanding Section 6 of the Stock Purchase Agreement, GEDA would be further prohibited from offering for sale any of the MCS shares within 180 days of the May 21st Agreement. Both the Stock Purchase Agreement and supplemental Agreement (hereinafter referred to as "May 21st agreements") were signed by each of the 16 MCS shareholders and James Halliday, the GEDA Administrator.[2]

Less than two months after the May 21st agreements were entered into, GEDA was approached by Lee Holmes, who, with the support of David Ulloa, met with the GEDA Board on July 14, 1971 to discuss the possible sale of MCS. In its most basic terms, Holmes proposed to purchase 21,000 shares (70 percent) of MCS stock for a total purchase price of $42,000; to have GEDA offer, in varying amounts, 4,500 shares (15 percent) of MCS stock to the former MCS shareholders; to have GEDA retain the remaining 4,500 shares (15 percent) until the GEDA loan was paid off, at which time the shares were to be offered by GEDA to Holmes, D. Ulloa, Sablan, and three other former MCS shareholders at $4.00 per share; and to have both GEDA and FNCB increase their respective loans by $50,000 each.

Holmes' proposal was favorably greeted by the GEDA Board, and on July 20, 1971, a meeting between Holmes, three of the seven GEDA Board members, and five of the former MCS shareholders was held to further discuss the proposal. This meeting resulted in the drawing up of an Agreement, dated July 20, 1971, providing for the cancellation of both the former MCS shareholders' right of first refusal contained in Section 6 of the May 21st Stock Purchase Agreement and the 180-day prohibition of the sale of MCS stock contained in paragraph 2 of the May 21st supplemental Agreement. The July 20th Agreement was conditioned upon the execution of a contract by Holmes, GEDA, and MCS for the sale of MCS stock to Holmes, and was signed by Guy Wharton (on behalf of GEDA), Holmes, and all of the 16 former MCS shareholders except Richard Cruz and Robert and Joan Halsey.

Further meetings of the GEDA Board were held on August 2 and 3, 1971, and by an Agreement for Sale of MCS Stock dated August 4, 1971, GEDA agreed to sell 70 percent of the MCS stock to Holmes on the terms described above, with the exception of the deletion of any reference to a $50,000 matching loan from FNCB. This August

---

2. A question subsequently arose as to whether Halliday possessed the authority to bind GEDA to the May 21st agreements. At a GEDA Board meeting held on August 3, 1971, the Board unanimously agreed to ratify the May 21st agreements. See C.T. 59.

4th Agreement was signed by Jesus Guerrero (on behalf of GEDA), Halliday (on behalf of MCS), Holmes, and witnessed and signed by D. Ulloa and one J. S. Perez.

Pursuant to the terms of the August 4th Agreement, the shares of MCS stock prescribed therein were sold by GEDA to Holmes and the former MCS shareholders. On February 28, 1972, the 16 former MCS shareholders filed suit, claiming, *inter alia*, that due to the bad faith of defendants Holmes and GEDA, the latter had failed to first offer to them, as required under the May 21st agreements, the 21,000 shares of MCS stock sold to Holmes. The former MCS shareholders therefore requested that the court impose a constructive trust in favor of them over the 21,000 shares.

The trial court ruled in favor of Holmes and GEDA, and six of the former shareholders appealed, raising a number of issues for this Court's consideration.

 Appellants first claim that the July 20th Agreement, under which the former MCS shareholders purportedly waived their rights of first refusal, is not a binding agreement due to the lack of a quorum of the GEDA Board. It is clear that the July 20th Agreement was not properly transacted due to the absence of a Board quorum. Guam Government Code, § 53558(c). While no Guam case law exists on this point, it is also clear, however, that the general rule with respect to ratification is that

> "ratification of a contract or other act will be implied if the corporation, represented by the board of directors, who have knowledge of the facts, accepts and retains the benefits of the contract or act, or recognizes it as binding, or acquiesces in it. They may ratify by acquiescence, and need not act at a meeting regularly called, but may ratify without any formal action. . . ." 2 Fletcher Cyc. Corp. § 762.

*See also Petroleum Anchor Equipment, Inc. v. Tyra*, 419 S.W.2d 829, 834 (Tex.Sup. Ct.1967) ("Ratification of an unauthorized act may be express or it may be implied from a course of conduct . . .."); *See-Tee Mining Corp. v. National Sales, Inc.*, 76

N.M. 677, 417 P.2d 810, 812 (1966) ("Ratification of the action of a corporate officer for which there may have been no antecedent authority may be express or implied [citations omitted], and may be implied by the corporation's acquiescence in or recognition of its officer's unauthorized act, or by the corporation's acts tending to show an acceptance or adoption of the contract [citations omitted]."); *Monteleone v. Southern California*, 264 Cal.App.2d 798, 70 Cal.Rptr. 703 (Second Dist.1968); *Johnson v. Community Development Corp.*, 222 N.W.2d 847 (N.D.Sup.Ct.1974); 19 C.J.S. *Corporations* § 1141 (1940).

That the GEDA Board possessed the original authority to enter into a contract in the nature of the July 20th Agreement cannot be disputed. Guam Government Code, § 53553.

An examination of the conduct of the GEDA Board subsequent to the signing of the July 20th Agreement unequivocally demonstrates Board action sufficient to establish ratification. As the July 20th Agreement states in paragraph 4 thereof, the Agreement was conditioned upon the execution of a contract for sale of MCS stock to Holmes among GEDA, MCS, and Holmes. Holmes in fact subsequently submitted a proposed contract of sale for GEDA's consideration, paragraph 5 of which explicitly referred to the fact that by the July 20th Agreement, GEDA and the former MCS shareholders agreed to abrogate the latter's rights of first refusal contained in the May 21st agreements. This paragraph was specifically discussed at the August 2nd and 3rd GEDA Board meetings. The following notation was entered in the minutes of the August 3rd meeting:

> "Section [paragraph] 5 [of Holmes' proposed contract]—The Administrator [of GEDA] pointed out that the last part of this section regarding the abrogation of the former shareholders had been changed to read . . . 'GEDA will jointly with Holmes and MCS defend any claim thereon by any persons or other entity. . . .' The Board agreed to this."

Therefore, not only did the GEDA Board recognize the existence of the July 20th Agreement, but it was even willing to go so far as to agree to defend Holmes and MCS on any claim arising from the Agreement. Finally, of course, by that Agreement for Sale of MCS Stock dated August 4, 1971, and agreed upon at the August 2nd and 3rd Board meetings, GEDA agreed to sell 21,000 shares to Holmes, despite the fact that on the previous day, the Board had specifically ratified the May 21st agreements containing the former MCS shareholders' rights of first refusal. Paragraph 5 of the August 4th Agreement both recognized the July 20th abrogation of the former shareholders' rights of first refusal and asserted the obligation to defend noted above. Appellants do not contend that quorum was lacking at the August 2nd and 3rd meetings, and, as indicated previously, the August 4th agreement was witnessed and signed by D. Ulloa. Subsequently, of course, GEDA did in fact sell MCS stock to Holmes and the former shareholders pursuant to the August 4th Agreement.

Under these circumstances, for this Court to now hold that the July 20th Agreement was not ratified by the Board would not only serve to completely vitiate the clearly expressed intent of the Board and elevate mere formalism over substance, but would also serve to permit the former MCS shareholders to evade a contract they freely and willingly entered into.

■ Richard Cruz raises the further argument that because he did not sign the July 20th Agreement, it was not binding upon him. Section 6 of the May 21st Stock Purchase Agreement provides in pertinent part that:

"GEDA shall not transfer, alienate or in any way dispose of any shares of the Company unless such share shall first have been offered for sale to the Stockholders. . . . This right of first refusal is not an individual right to a shareholder to reacquire the shares transferred by that individual stockholder by this agreement or any other shares. The right of first refusal is a collective right

and all shares offered for sale by GEDA must be acquired under the same terms and conditions as set forth in the preceding paragraph."

Section 7 (entitled "Miscellaneous") of the Agreement states in subsection (a) that:

"This agreement contains the entire agreement between the parties and can only be changed by agreement in writing signed by the party against whom enforcement of any change, waiver, modification or discharge is sought."

This Court agrees with the trial court that the term "collective right," even when read in conjunction with Section 7(a) of the Agreement, is ambiguous, and we agree with the trial court's interpretation thereof. As pointed out by the district court, the May 21st agreements were entered into at a time when MCS was in dire financial straits. GEDA, in assuming control over the corporation, obviously needed as much flexibility and freedom to operate as possible. To hold that the May 21st agreements could be modified only by unanimous consent of the 16 former MCS shareholders (some of whom owned but a *de minimis* fraction of the outstanding shares) would amount to an unreasonable interpretation of the term "collective right" in light of the risk such an interpretation would impose upon the future success and viability of the corporation. Moreover, the "non-unanimity" view was expressed both orally and in writing by Charles Troutman, legal counsel to GEDA, and no objection to such a view was voiced by any of the former MCS shareholders.

■ Further support of the trial court's interpretation can be found in § 1431 of the Guam Civil Code, which section provides in pertinent part that:

"An obligation imposed upon several persons, or a right created in favor of several persons, is presumed to be joint and not several. . . . This presumption in the case of a right, can be overcome only by express words to the contrary."

In interpreting the words "joint right," § 130(b) of the Restatement, Contracts, provides that:

". . . . [A] discharge by a joint obligee of his individual right operates as a discharge of the joint right of all . . .

"Illustration:

"1. A, B and C have a joint right to the delivery of a horse by D. A discharged D from any duty to himself in consideration of $50 paid by D to A. This discharges D's duty to B and C as well as to A. It would be otherwise if with D's knowledge, A was acting with intent to defraud B and C."

*See also Forbes v. First Camden National Bank*, 25 N.J.Super. 17, 95 A.2d 416, 418–419 (1953) ("[I]t is the general rule that each of several joint obligees has power to discharge the entire claim by release, or accord and satisfaction, or the acceptance of payment of other performance. Thus, in *Ely v. Ely*, 70 N.J.L. 31, 56 A. 246 (Sup.Ct. 1903), one joint creditor, acting without the knowledge or consent of his co-obligee, accepted from the debtor a horse and a small sum of money in satisfaction of the debt; and the court held that the obligation to both creditors was discharged. To a like effect are Restatement, Contracts, § 130; Williston, Contracts, § 344; and Annotation in 142 A.L.R. 371. Professor Williston, at § 317, finds an implied agency whereby each obligee is empowered to act for all in relation to the debt.").

■ The language of the May 21st agreements does not succeed in overcoming the presumption created by § 1431 of the Guam Civil Code that the right of first refusal possessed by the former MCS shareholders was joint, and not several. By releasing GEDA of its promise to afford the former MCS shareholders first refusal in consideration for the right to later purchase MCS stock, the signatories to the July 20th Agreement thereby discharged GEDA of its obligation to the other former MCS shareholders (i. e., Cruz and the Halseys) as well.

Appellants further contend that even if the July 20th Agreement is deemed to be binding upon all parties concerned, Holmes and/or GEDA acted fraudulently, in bad faith, and/or breached their fiduciary duties, and a constructive trust over the 21,000 shares owned by Holmes should therefore be imposed in favor of them.[3] The trial court held that "Plaintiffs have not pled nor have they presented any evidence to show the existence of fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act." (C.T. 701.)

■ The complaint in this case was filed on February 28, 1972. Trial was ordered set for October 28, 1975. On October 20, 1975, GEDA and Holmes filed a Trial Memorandum in which they stated, *inter alia*, that since fraud had been neither specifically pleaded in the complaint as required by Rule 9(b) of the Federal Rules of Civil Procedure nor included in the pre-trial order as an issue for trial, the plaintiffs should be precluded from trying the issue of fraud. In a memorandum filed October 22, 1975, the plaintiffs conceded that with respect to the issue of fraud, they had failed to satisfy the specificity requirements of Rule 9(b) and include it in the pre-trial order. The plaintiffs therefore moved to amend the pre-trial order so as to include the issue of fraud. This motion was denied by the trial court, apparently on the ground that it was "untimely and prejudicial to the defendants and was not supported by the evidence." (C.T. 687.) Although Appellants claim in their Opening Brief that "There was no 'undue prejudice' to defendant because the discovery proceedings had made amply clear to defendants the intention of plaintiffs to introduce such evidence," they are unable to point to anything in the record to support this contention. Given the complete failure of Appellants to substantiate their claim of lack of undue

3. Section 2224 of the Guam Civil Code provides that:

"One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

prejudice, the failure to specifically identify fraud in any of the pleadings, the three-year delay in moving to amend the pre-trial order (which order was filed on October 18, 1972), and the raising of the issue of fraud on the eve of trial, we cannot say that the trial court abused its discretion in denying the plaintiffs' motion.

Appellants also contend that the trial court erred in denying their post-trial motion to amend the pre-trial order to conform to proof. F.R.Civ.P. 15(b). While it is true that the trial court did state that the plaintiffs had failed to plead the existence of fraud, it also found that the plaintiffs failed to present any evidence to show the existence of fraud. Under these circumstances, then, the question of whether the trial court erred in denying the motion to conform to the evidence collapses into the issue of whether the trial court erred in concluding that the plaintiffs had failed to prove the elements of a constructive trust (discussed *infra*).

■ Finally, Appellants argue that fraud was simply a "defense to Appellees' defense" and therefore did not fall within the specificity requirements of Rule 9(b). Whether a "defense to a defense" falls within Rule 9(b) is a question we need not answer at this time, for it is clear that the thrust of the plaintiffs' complaint was to seek a constructive trust over the shares owned by Holmes. As provided by § 2224 of the Guam Civil Code, fraud, mistake, undue influence, etc., must be established in order to obtain a constructive trust. If the plaintiffs intended to rely upon fraud as a basis for obtaining a constructive trust, it was an element which had to be affirmatively pleaded and proved and therefore fell within the prescriptions of Rule 9(b).

■ Appellants claim that they are entitled to a constructive trust on the ground that they were induced into entering into the July 20th Agreement by the fraudulent representation of Holmes that he would obtain a firm loan commitment from FNCB prior to purchasing any MCS stock from GEDA. In fact, no such loan commitment was ever obtained from FNCB, or any other lending institution.

As those portions of the transcript of the July 20th meeting between the former MCS shareholders and GEDA Board members quoted in the margin clearly indicate, however, D. Ulloa specifically agreed to withdraw the shareholders' request for a firm loan commitment.[4] That the sale of MCS stock to Holmes was not made contingent upon the securing of a loan commitment is made even clearer by the following statement made by D. Ulloa at the July 20th meeting:

"Mr. Ulloa: I think with the understanding that—it's solely between GEDA and Mr. Holmes—if the bank does not come up with these funds, or whatever the source that Mr. Holmes has as far as his resources to raise money, I think we could leave it up to you people—I think GEDA, we're going to let GEDA be the guardian of our interest, then and see that they weight the factor and in the event that there's no—conceivable there's no commitment anyplace, I think it's entirely up to GEDA to consummate the deal or not."

4. "Mr. Ulloa: In other words, you're saying that the agreement between you and GEDA would be contingent upon securing this thing from the bank?

"Mr. Holmes: Absolutely. You bet. That's why I don't want to have them sign the thing too. By gosh, to get the bank to sign a contract—it's a lot different, you an sign a note to the bank and they're very happy to okay it, but to get a bank to sign a contract, I don't know what that involves with this bank here. I know what it involves in the States. They've got to get the loan board together, or somebody else (comment here by Mr. Ulloa but cannot be understood) and it's a real paid (sic). I just think it's an unnecessary complication.

"Mr. Cepeda: Mr. Holmes, I don't think Mr. Ulloa's referring to having the bank in the contract itself, signing it.

"Mr. Ulloa: No.

"Mr. Cepeda: Just a condition in there that the $50,000.00 as proposed in your letter be raised by either First City Bank or any other lending institution, or for that matter, probably any individual as a loan to MCS.

"Mr. Ulloa: Yeah, you know, we don't care what the source is." R.T. 253–254.

The above statement of D. Ulloa clearly indicates that the former MCS shareholders were forsaking any further interest in the question of whether Holmes would be able to obtain additional funds and from what source, and that it was entirely up to GEDA and Holmes as to whether any MCS shares would be sold to Holmes.

That Holmes was not being required to obtain any loan commitment prior to his purchase of MCS stock is further substantiated by those portions of the transcript of the August 3rd GEDA Board meeting quoted in the margin.[5] Moreover, the August 4th Agreement embodying the sale of the MCS stock to Holmes is absolutely devoid of any reference to the procurement of any loan commitment either as a condition precedent or subsequent to the sale. As previously indicated, this Agreement was witnessed and signed by D. Ulloa without objection.

Even assuming, *arguendo*, that fraud should have been properly included by the trial court as an issue for trial, the above evidence demonstrates that the trial court did not commit clear error in holding that the plaintiffs failed to fulfill the require-ments of a constructive trust. In light of this Court's holding, we need not reach the remaining issues raised by Appellants.

The judgment of the district court is hereby AFFIRMED.

---

5. "Mr. Holmes: Does it have to be FNCB?

"Mr. Wharton: I was going to say that we could make that FNCB or some other financial institution, or some other lender.

"Mr. Guerrero: Or some other lending institution.

"Mr. Wharton: Or some other lender, it doesn't have to be an institution.

"Mr. Perry: Some other source.

"Mr. Guerrero: Some other lender acceptable to GEDA, you know, could be an individual, could be anybody.

"Mr. Holmes: Well, let's say if worse comes to worse and FNCB turns it down. If FNCB turns it down in New York, then we don't have a deal, it's back in your hands.

"Mr. Guerrero: Well, you would have a deal at that point, see, but then you would have to look for the money someplace else.

. . . . .

"Mr. Guerrero: Is there any source where you could get this money if you don't get it from the FNCB?

"Mr. Holmes: Yeah.

"Mr. Guerrero: If we make the agreement flexible as to that—

"Mr. Holmes: I'd rather make it—I don't want to say 'lending institution' in other words—

"Mr. Halliday: Any source.

"Mr. Guerrero: Any source. Any source, as long as the money comes in.

"Mr. Holmes: Any other source.

"Several: Any other source.

"Mr. Holmes: All right. Twenty thousand from Holmes.

"Mr. Guerrero: Is that agreeable?

"Several: Yes." R.T. 449–456.

Appellants contend that while David Ulloa did in fact attend the August 3rd meeting, none of Appellees' witnesses at the trial testified that Ulloa was present throughout the entire meeting. But neither do Appellants point to any testimony which indicates that Ulloa was *not* present throughout the meeting. Both the transcript and minutes of the August 3rd meeting clearly indicate that Ulloa was present. Furthermore, while the minutes of the August 3rd meeting specifically note the fact that at one point in the meeting, Holmes left the meeting, no such similar notation exists with respect to Ulloa. Finally, even if Ulloa was not present throughout the entire meeting, he witnessed and signed the August 4th Agreement without objection. That agreement contained no promise or representation by Holmes that he would procure a firm loan commitment from FNCB or any other lending institution.